JOHN F. GHEE, Appellant, *v.* THE NORTHERN UNION GAS
COMPANY et al., Respondents.

1. NEW YORK: CITY — CONSENT REQUIRED TO CONFER FRANCHISE
UPON GASLIGHTING CORPORATION CAN BE GIVEN ONLY BY MUNICIPAL
ASSEMBLY. Under the provisions of the Greater New York charter (L.
1897, ch. 378), the consent that is required by section 61 of the Transpor-
tation Corporations Law (L. 1890, ch. 566) tö confer a franchise upon a
gaslighting corporation can be given only by the municipal assembly,
through appropriate ordinances.

2. SUBSEQUENT PERMITS FROM ADMINISTRATIVE CITY OFFICERS. When
the consent of the municipal assembly has been granted to a gaslighting
corporation duly created, by which a corporate franchise, which is prop-
erty, has been acquired, the administrative officers of the city, namely the
commissioner of public buildings, lighting and supplies and the commis-
sioner of highways, must be applied to for a permit that will allow the
corporation to exercise such rights in order that the public convenience
may be subserved.

3. TERM "MUNICIPAL AUTHORITIES" MEANS MUNICIPAL ASSEMBLY.
In the city of New York the "municipal authorities," within the mean-
ing of that term as used in section 61 of the Transportation Corporations
Law, whose consent is required to lay conductors for conducting gas
through the streets of the city, are the municipal assembly.

*Ghee* v. *Northern Union Gas Co.*, 34 App. Div. 551, reversed.

(Argued February 28, 1899; decided April 18, 1899.)

APPEAL, by permission, from an order of the Appellate
Division of the Supreme Court in the first judicial depart-
ment, made November 25, 1898, affirming an order of Special
Term denying a motion to continue a preliminary injunction
and vacating the injunction.

This is a taxpayer's action brought under chapter 301 of
the Laws of 1892, to restrain the laying of gas mains in cer-
tain streets in New York city, upon the grounds that the
defendant the Northern Union Gas Company which is laying
the mains, has no franchise or right to do so, and that certain
officials of the city, viz., the commissioner of highways and
the deputy commissioner of highways of the borough of the
Bronx, have illegally granted a permit for the laying of the

mains and are aiding and assisting the gas company in laying them without authority of law.

The question certified for review and the facts, so far as material, are stated in the opinion.

*Elihu Root* and *Henry G. Atwater* for appellant. **The** history of the New York charters shows that no substantial change in the distribution of the powers of the different departments of the city government has been made by the charter of 1897. (L. 1862, ch. 361; L. 1873, ch. 335, § 71; L. 1882, ch. 410, §§ 316, 317, 322; *Anderson* v. *E. G. L. Co.*, 12 Daly, 462; L. 1897, ch. 378, §§ 17, 49; *People ex rel.* v. *Gilroy*, 67 Hun, 323; L. 1886, ch. 248.) The power to give consents is a legislative power and must be exercised by the legislative body. (*Smith* v. *M. G. Co.*, 12 How. Pr. 187; *People ex rel.* v. *Deehan*, 153 N. Y. 530; *Matter of N. Y. E. R. R. Co.*, 70 N. Y. 327; *Matter of K. C. E. R. R. Co.*, 105 N. Y. 111; *Beekman* v. *T. A. R. R. Co.*, 153 N. Y. 144; *C. C. T. Co.* v. *K. C. R. R. Co.*, 153 N. Y. 540; *City of Brooklyn* v. *Jourdan*, 7 Abb. [N. C.] 23; *People* v. *O'Brien*, 111 N. Y. 32; *S. R. T. Co.* v. *Mayor, etc.*, 128 N. Y. 510; *White* v. *M. R. Co.*, 139 N. Y. 19.)

*Thomas Allison* and *Francis B. Chedsey* for respondents. The order appealed from must be affirmed or the appeal dismissed, for the reason that, even if this court answered in favor of the appellant the only question which has been certified to it for decision, that would not finally or necessarily defeat respondent's right to the order appealed from. (*Blaschko* v. *Wurster*, 156 N. Y. 437.) So far as municipal authority is concerned, the only consent needed by the respondent to authorize it to lay the pipes in question was that of the commissioner of the department of public buildings, lighting and supplies, approved by the department of highways. (L. 1897, ch. 378, §§ 45, 49, 416, 525, 573; *State* v. *C. G. Co.*, 118 Ohio St. 262; *Indianapolis* v. *I. G. Co.*, 66 Ind. 396; 2 Dillon on Mun. Corp. [3d ed.] 690, § 692; *Abraham* v. *Meyers*, 29 Abb.

[N. C.] 384; *Knox* v. *Mayor, etc.*, 55 Barb. 404; *City of Brooklyn* v. *Jourdan*, 7 Abb. [N. C.] 23.)

PARKER, Ch. J. The question that the Appellate Division on the appeal herein allowed by it certifies should be reviewed by this court reads as follows: "Are the municipal authorities of the city of New York, whose consent is required to lay conductors for conducting gas through the streets of such city, under the Transportation Corporations Law, the head of the department of public buildings, lighting and supplies, and the head of the department of highways, under the powers conferred by the charter of the city of New York, or are the ' municipal authorities ' referred to in the said Transportation Corporations Law the municipal assembly, or any other officer or body in the city of New York?" Section sixty-one of the Transportation Corporations Act (chapter 566 of Laws of 1890) provides in substance that if a corporation be incorporated for the purpose of supplying gas for light in the city, town or village where it is located, it must first obtain the consent of the municipal authorities thereof. Such provision is a re-enactment of section eighteen, chapter thirty-seven of the Laws of 1848, known as the Gas Companies' Act, and has, therefore, been in force more than fifty years. During all that period of time and until the enactment of the Greater New York charter by chapter 378 of the Laws of 1897, the common council of cities, having local and limited legislative authority, has been recognized and held to be the municipal authority whose consent is required by the statute we have referred to. Authorities might be cited in support of this assertion, but that is not needful as it is unquestioned. Indeed, it is conceded in the very thoughtful opinion of the learned justice at the Appellate Division, that prior to the charter of 1897 the common council of the city of New York constituted the " municipal authorities " within the meaning of the statute, and that that has been too frequently decided to admit of question. After an examination of the charter of 1897, however, the conclusion was reached that the legislature had

by it not only refrained from conferring the power upon the municipal assembly to give the consent provided for by the Transportation Corporations Act, but had by sections 523, 524 and 525 of the charter expressly granted to the commissioner of public buildings, lighting and supplies and the commissioner of highways the authority to grant such consents.

At the threshold of the consideration of these questions, it will be well to have in mind the legal effect of the consent which the municipal authorities are authorized to give by the Transportation Corporations Act. It operates to create a franchise by which is vested in the corporation receiving it a perpetual and indefeasible interest in the land constituting the streets of a municipality. It is true that the franchise comes from the state, but the act of the local authorities, who represent the state by its permission and for that purpose, constitutes the act upon which the law operates to create the franchise. The state might grant the franchise directly to the corporation without the consent of the local authorities, and has done so in many instances; but the tendency of later years, which is well grounded in reason, is for the state to confer upon the local municipal authorities the right to represent it in the matter of granting franchises to the extent that the final act necessary to the creation of franchises must be exercised by such authorities. The legal effect of the consent, therefore, is the same as if the local authorities in form granted the franchise and the interest in the land. (*People ex rel. Woodhaven Gas Co.* v. *Deehan,* 153 N. Y. 528.) The court said, at page 532 : " The consent of the town authorities conferred upon the relator a franchise to carry on its business in the town and to lay conductors in the streets and highways for the purpose of delivering gas. That such a franchise is property that cannot be destroyed or taken from it or rendered useless by the arbitrary act of the village authorities in refusing the permit to place the conductors under the streets." If it be true that the legislature, by the charter of 1897, has taken away from the legislative branch of the city government, elected by the people, the power to confer franchises of this

character, and transferred to two subordinate administrative officers authority to grant them and alienate a portion of the title in the streets, which the city holds in trust, then it is apparent that a very important and seemingly unwise step has been taken from the path that had been followed for half a century. The use of the space in the streets of New York, whether on the surface or beneath it, has been steadily growing in importance and value, and will probably so continue for many years to come. The accumulation under ground, during the past few years, of sewers, electrical subways, cable and electrical railway conduits, pneumatic tubes, steam-heating, water and gas pipes, seems to indicate that the day may come when there will be no more unoccupied space beneath the surface of the streets, and of this situation the legislature and the learned commissioners who drafted the charter undoubtedly had full knowledge. It is difficult to believe that, with such knowledge, they would attempt to take away from general and responsible representatives of the people the power to grant such important and valuable rights and vest them in subordinate administrative officers, and a full understanding upon this important subject, of the views of the commissioners who drafted the charter, will help us in its examination. The committee on draft reported under the head of municipal ownership, among other things, the following : " There is naturally a diversity of opinion in the committee upon this subject. From an original and ideal standpoint it is easy to see that the city would become the recipient of vast revenues by the ownership and operation of *all franchises for lighting by gas or electricity and for tramways* and other purposes necessary to the life and business of a metropolitan community and exercised so largely by a use of the streets and avenues belonging to the people. * * * We have, however, provided for the future that *all franchises* operated principally by the use of the public streets should be granted by way of a lease for a period not exceeding twenty-five years. * * * " Here we find unmistakable evidence that the committee fully appreciated that the right to use the streets for lighting by gas con-

stituted a franchise, and further that it was regarded by them as a matter of serious importance and entitled to be classed for the purposes of consideration with the use of the streets for tramways and other purposes necessary for the life and business of the community. The commission in its report to the legislature, under the head " of the charter scheme of the municipal assembly," said in part : " It is a marked feature of the charter now presented that it differentiates the powers relating to franchises, the creation of debt, the expenditure of money, the laying of taxes and assessments — these being the only powers liable to serious abuse — from the ordinary powers of the municipality embracing the countless subjects requiring municipal regulation. The former class of powers the commission has protected against abuse by special and appropriate safeguards — safeguards which are in some respects unique and will in its judgment prove effective. Thus as to franchises and their disposition the charter proposed a radical change of the highest importance and value. The streets of the city belong of right to the whole people. Their use for the public benefit and their control in the public interest ought never to be permanently parted with in favor of any private interests whatever. The charter, therefore, declares that they are inalienable and that no rights therein shall hereafter be granted by the municipal assembly except upon the approval of the board of estimate and apportionment, and then only for limited periods, and upon provision being made for periodical revaluations." We shall not stop to comment on this statement further than to call attention to the purpose avowed by the commissioners of preventing for the future an absolute alienation of an interest in the public streets in favor of private interests, and that in order to accomplish that result they regarded it necessary to prohibit the municipal assembly from granting any rights therein except for limited periods.

Before entering upon an examination of the provisions of the charter relating to the power of the municipal assembly, it should be stated that the respondent is correct in his asser-

tion that the charter of 1897 does not contain any provision in terms authorizing the municipal assembly to give consent for the use of the streets for gas lighting purposes. But it is equally true that, prior to the charter of 1897, there was no statute expressly granting such power to the common council. Nevertheless, it is admitted that it has frequently been held that such power existed, and, indeed, it is conceded that, prior to the charter of 1897, the common council did have such power. Now the foundation for these decisions and this concession is that the municipal authorities, within the meaning of the Transportation Corporations Act, consisted of the body in each municipality in which was vested the local legislative authority, and from the date of the Dongan charter (Valentine's Laws of the City of New York, page 201) the common council has been the only local body authorized to legislate in behalf of the city of New York. The charter of 1857 provided : "The legislative power of the said corporation shall be vested in a board of aldermen and a board of councilmen, who, together, shall form the common council of the City of New York." (Laws 1857, ch. 446, § 2.) The charter of 1873 provided : "The legislative power of the said corporation shall continue to be vested in  *  *  *  the common council." (Laws 1873, ch. 335, § 2.) The charter of 1882 provided: "The legislative power of the said corporation shall continue to be vested in a board of aldermen," etc. (Laws of 1882, ch. 410, § 29.) And the present charter provides: "The legislative power of The City of New York shall be vested in  *  *  * The Municipal Assembly of The City of New York." It necessarily follows from this grant of legislative power to the municipal assembly that, in the absence of any provision in the charter conferring the authority upon other officers to represent the legislature in the giving of such a consent as will create a franchise for the use of the streets for gas-lighting purposes, the grant of all local legislative power to the municipal assembly operates to confer upon it the authority to grant or refuse such consents.

Other provisions of the charter relating to the municipal

assembly will now be briefly referred to. These provisions are divided into three classes. The first re-enacts in substance the general grants of power to legislate for the city in respect to the city streets, contained in previous charters, and reads as follows: (§ 49) "Subject to the provisions of this act, the municipal assembly shall have power within said city to make, establish, publish and modify, amend or repeal ordinances, rules, regulations and by-laws * * * for the following purposes: 4. To regulate by general ordinance, the opening of street surfaces for purposes authorized by law. 7. To regulate the use of the streets and sidewalks, for signs, sign posts, awnings, awning posts, horse troughs, urinals, telegraph posts and other purposes. 8. To provide for and regulate street pavements, crosswalks, curbstones, gutterstones, sidewalks, and to provide for regulating, grading, flagging, curbing, guttering, and subject to the provisions of this act, lighting streets, roads, places and avenues." The provisions of previous statutes, thus in substance re-enacted, may be found in sections two and seventeen and subdivision five of chapter 335 of the Laws of 1873, and in section eighty-six and subdivision five of chapter 410, Laws of 1882.

The second class has reference to the relative functions of the municipal assembly and the board of public improvements, to which the commissioner of public buildings, lighting and supplies and the commissioner of highways belong, and who, it is insisted, have succeeded to the power that formerly belonged to the legislative body of the city to give such a consent to a gas corporation as under the Transportation Corporations Act operates to create a franchise. Section 416 provides: "It shall be the duty of the board of public improvements to prepare and to recommend to the municipal assembly all ordinances and resolutions regulating the following matters: 4. The use of the streets and sidewalks for signs, sign posts, awnings, awning posts, horse troughs, urinals, telegraph posts and other purposes. 10. The laying of gas pipes and electric wires under ground, steam pipes, pneumatic tubes and the like, and the lighting of all public thoroughfares,

places, bridges and buildings, the inspecting and testing of gas
or electricity employed for light, heating and power, gas
meters, electric meters, electric wires, the use and transmission
of electricity for all purposes in, upon, across, over and under
all streets and public buildings, and the opening of street
surfaces for the business of manufacturing, using and selling
electricity, gas, steam, or for the surface of pneumatic tubes."
In the third class may be found provisions specifically limiting
the municipal assembly in the exercise of its power to grant
franchises, and is to be found in chapter three, entitled
"Franchises and grants of land under water." Section 71.
"The rights of the city in and to. its water front, ferries,
wharf property, land under water, public landings, wharves,
docks, streets, avenues, parks, and all other public places are
hereby declared to be inalienable." 

Section 72. "Every grant of or relating to a *franchise of
any character* to any person or corporation must, unless other-
wise provided in this act, be by ordinance." As we have
already seen, the consent of the municipal authorities pro-
vided for in section sixty-one of the Transportation Corpora-
tions Act operates to create a franchise, and, therefore, if not
technically a grant, it at least relates to a franchise and is spe-
cifically prohibited by this section unless granted by ordinance.
Now, the commissioner of public buildings, lighting and sup-
plies and the commissioner of highways have not the power
to pass ordinances, but the municipal assembly has, and this
section does not require a second reading to reach the con-
clusion that the framers of it could not have intended to
provide elsewhere that certain subordinate municipal admin-
istrative officers could create a franchise. Section 73 provides:
"After the approval of this act *no franchise or right* to use
the streets, avenues, parkways or highways of the city shall
be granted by the municipal assembly to any person or corpo-
ration for a longer period than twenty-five years  *  *  *."
From the examination so far made, therefore, it appears that
the grant of legislative power to the municipal assembly is as
broad as that previously granted to the common council of

New York, which was comprehensive enough to constitute it the " municipal authorities " within the meaning of the term as employed in the Transportation Corporations Act; that the provisions of the title relating to franchises, which, while placing limitations upon the powers of the municipal assembly, necessarily imply that the power to grant such franchises rests in that body, and in that body only, while section seventy-five of the same title vests in the municipal assembly the power to pass appropriate ordinances to carry the provisions of the title into effect. That title relates to all franchises; prescribes how they shall be granted, and for what length of time, not exceeding twenty-five years, and for renewals not exceeding twenty-five years in the aggregate on a fair revaluation. Section 75 reads as follows: " The municipal assembly may from time to time pass appropriate ordinances, not inconsistent with the Constitution and laws of the state, to carry the provisions of this title into effect    *    *    *." Our attention is called to the fact that section forty-five, of the charter of 1897, in terms confers upon the municipal assembly authority to grant franchises or the right to construct and operate railways upon the streets of the city, and it is urged that the omission to confer specifically a like power upon the municipal assembly as to the franchises of gas companies is significant and strongly indicative of a settled purpose to take away that right from the legislative body. While the section is entitled to and has received our consideration in an examination of the whole subject, we do not deem it entitled to such weight as will bear down the provisions to which reference has been made. The granting of franchises to street surface railways may well have been deemed by the commissioners a duty concerned with the most important of all the franchises, and, therefore, worthy of independent treatment and a separate section; but there are many franchises that may be created by the consent of the municipal authorities, and the authority of the common council to create them had been embodied in the provisions of previous charters, and as we have already seen those provisions

are substantially re-enacted in the charter of 1897. The purpose to take over to the municipal assembly all the power conferred upon the common council of the city of New York is to be found in section forty-six of the present charter, which provides that "except as otherwise provided in this act all the powers and duties conferred or charged upon the common council or the mayor, aldermen and commonalty of the city of New York, or the board of aldermen thereof, * * * * shall be exercised and performed by the municipal assembly of the city of New York." This purpose is further evidenced and assured by section 1608 of the charter. "So far as the provisions of this act are the same in terms or in substance and effect as the provisions of the said Consolidation Act * * * this act is intended to be not a new enactment, but a continuation of the said Consolidation Act of 1882 * * * and is intended to apply the provisions thereof as herein modified to the city of New York as herein constituted, and this act shall accordingly be so construed and applied." Again, that the specific grant of power to the municipal assembly in the matter of granting franchises to street railways, as provided by section forty-five, was not intended to limit or affect the legislative power in respect to other franchises, is to be found in section fifty, which immediately follows the provisions of section forty-nine, containing an express enumeration of special subjects upon which the legislative body may make ordinances; it provides: "*The foregoing or other enumeration of powers* in this act shall not be held to limit the legislative power of the municipal assembly which, in addition thereto, may exercise all of the powers vested in the city of New York by this act, or otherwise, by proper ordinances, rules, regulations and by-laws not inconsistent with the provisions of this act," etc.

This brings us to a consideration of the sections of the charter that are claimed to have conferred the power to consent upon the commissioner of the department of public buildings, lighting and supplies and the commissioner of highways. These two officers constitute the heads of two of the six depart-

ments included in the board of public improvements, and which are declared by the commission that drafted the charter to be intended to take the place of various agencies that have grown up under the existing charters, such as the department of public works and the corresponding departments in the other cities, the board of Croton aqueduct commissioners, the board of electrical control, the gas commission and the trustees of the New York and Brooklyn bridge. Before quoting the section, attention is again called to section 416 of the charter, which attempts to assign the relative functions of the board of public improvements and the municipal assembly, touching the matter of laying gas pipes and electrical wires under ground, the provision requiring the board to prepare and recommend to the municipal assembly all ordinances and resolutions regulating those matters among many others. It suggests at the outset that it would be strange indeed if a board, whose sole function as to the many legislative matters embraced within the numerous subdivisions of that section, is at end when it has recommended ordinances and resolutions regulating them, which the municipal assembly may pass or not as it sees fit, is nevertheless given power by other sections to take the place of the legislative body as to matters which have always been deemed as belonging specifically to it. Certainly the power will not be implied nor can a strained construction of the language of the statute be indulged in, in order that it may be so read. Effect can be given to it only in case the statute expressly commands it. The sections which it is claimed vest the power in the subordinate administrative officers named, are to be found in sections 573, 524 and 525 of the charter and are as follows : " § 573. The commissioner of the department of public buildings, lighting and supplies *shall have cognizance and control of :* * * * 2. Of the making and performance of contracts when duly authorized in accord with the provisions of this act, and for the execution of the same in the matter of furnishing the city, or any part thereof, with gas, electricity or any other illuminant ; of the selecting, locating and removing and changing of lights for

66.

the use of the city; of the inspecting and testing of gas and electricity used for light, heating and power purposes, gas meters, electric meters, electric wires and of all lights furnished to said city; and of the use and transmission of gas, electricity, pneumatic power and steam for all purposes in, upon, across, over and under all streets, roads, avenues, parks, public places and public buildings; of the construction of electric mains, conduits, conductors, and subways in any such streets, roads, avenues, parks and public places, and the granting of the permission to open streets, when approved by the department of highways, and to open the same for the purpose of carrying on therein the business of transmitting, conducting, using and selling electricity, steam, or for the service of pneumatic tubes."

" § 524. The commissioner of highways *shall have cognizance and control:* 1. Of regulating, grading, curbing, flagging and guttering of streets and laying of crosswalks. 2. Of constructing and repairing public roads. 3. Of paving, repaving, resurfacing and repairing of all streets, and of the relaying of all pavements removed for any cause.   \*  \*  \*"

" § 525. No removal of the pavement or disturbance of the surface of any street for the purpose of constructing vaults or lateral ways, digging cellars, laying foundations of buildings or other structures making sewer connections, or repairing sewers or pipes, of laying down gas and water pipes, steam pipes and electric wires, or introducing the same into buildings, or for any purpose whatever, shall be made until a permit is first had from the department of highways.   \*  \*  \*"

It is clear that section 573 was designed to give the commissioner of public buildings, lighting and supplies some authority regarding the use and transmission of gas in and under the streets of the city; but the question is, what authority? Is it the authority to regulate the use of the streets by a duly authorized corporation after its franchise has been granted? Or does the authority vest it with the power to grant a franchise for such use and to convey a perpetual and indefeasible interest in the land constituting the street? It is necessary

that some administrative officer have the authority to deter-
mine on which side or in which portion of a street gas pipes
shall be laid when the authority to lay them has been con-
ferred by the granting of a franchise for that purpose, as well
as to determine, when the pipes are being laid, how much of
the street shall be torn up and left open at any one time, the
most effective method of restoring the street to its former
condition and other details of the work, all of which are of
no small importance in many of the streets of a great city like
New York.   In order to confer such powers upon an admin-
istrative officer it was necessary to use broad and comprehen-
sive language, and such we think was the purpose of the
commissioners.   But it is said that the phrase "*shall have
cognizance and control of*" is far more comprehensive than is
required to vest the administrative officers with the power to
regulate and direct where and how and when the gas pipes
shall be laid in the streets, and that, in order to give it its
proper meaning, it must be assumed that more extensive
powers were intended than I have suggested, and such was the
conclusion of the Appellate Division; but that court did not
have the advantage of having its attention called to the fact
that these words were not devised by the draftsmen of this
charter.   They were taken from previous laws, which the
draftsmen wisely and necessarily consulted and made use
of throughout the charter whenever the provisions were
found to have stood the test of time and experience.   These
precise words were used to describe the authority of the Cro-
ton aqueduct department and the commissioner of public
works, whom the commissioner of public buildings, lighting
and supplies and the commissioner of highways succeeded.
Their first appearance was in an act conferring certain powers
upon the Croton aqueduct department.   (Laws 1862, ch.
361.)   The provision reads: "The Croton Aqueduct Depart-
ment of the City of New York *shall have cognizance,
control* and general direction   *   *   *   in the laying down
of gas and water pipes,   *   *   *   and no removal of pave-
ment for such purposes shall be made until a permit is first

had of the said Croton Aqueduct Department." They again appear in the charter of 1873, § 71: "The said department *shall have cognizance and control:* 3. Of opening, altering, regulating, grading, flagging, curbing, guttering and lighting streets, roads, places and avenues." (Ch. 335, Laws of 1873.) They were carried into the Consolidation Act of 1882. (§ 316.) "The department of public works *shall have cognizance and control:* 3. Of opening, altering, regulating, grading, flagging, curbing, guttering, and lighting streets, roads, places and avenues."

§ 322. "The Department of Public Works *shall have cognizance, control* and general direction * * * in the laying down of gas and water pipes, or introducing the same into buildings * * * and no removal of pavement for such purpose shall be made until a permit is first had from the said department."

Now, it is conceded that while these statutes were in force, and down to the enactment of the present charter the common council of the city of New York alone had power to grant a consent by which a franchise was conferred upon a corporation to use the streets for gas-lighting purposes, and it follows necessarily that the Croton aqueduct department, down to 1882, and the department of public works thereafter, did not have such power. Indeed, it is not pretended that they did have. The words "cognizance and control" were used for a period of thirty-five years before the Greater New York charter to describe a power strictly limited to the regulation of existing rights, and they cannot now be given an entirely different meaning from that in which they were used in the previous statutes referred to and relied upon, to some considerable extent, by the draftsmen of the present charter, in order to imply a power in these administrative officers, which otherwise, as we have seen, was properly vested in the municipal assembly. Examining the provisions of this charter bearing upon this subject, as we have, in the light of previous legislation, to which reference has been made, we have had no difficulty in reaching the conclusion that the con-

sent that is necessary to confer a franchise upon a gas-lighting corporation, can be given only by the municipal assembly through appropriate ordinances, but that when the consent has been granted to a corporation duly created, by which a corporate franchise, which is property, has been acquired, the administrative officers must be applied to for a permit that will allow the corporation to exercise such rights in order that the public convenience may be subserved. The permission forms no part of the franchise and is not essential to its existence, and, if refused, the granting of it may be compelled by mandamus, as, indeed, it has been in a number of cases, but the officers to whom application must be made may, within reasonable limits, fix the time when work on the streets may be begun, determine what portion of a street shall be first opened, how much of it may be left open at a time, the depth of the trench and other details, the careful regulation of which is of first importance to a metropolitan city like New York. And the sole purpose of these sections, as we read them, was to vest completely this important administrative power in the commissioner of public buildings, lighting and supplies and the commissioner of highways, leaving to the legislative department of the municipal government the power that has always belonged to it, of performing such act as the state has declared to be necessary in order to create a franchise.

The answer to the question certified to this court is, that, in the city of New York, the municipal authorities, within the meaning of that term as used in section sixty-one of the Transportation Corporations Law, are the municipal assembly.

The order should be reversed, with costs.

All concur.

Order reversed.