CITY OF VERMILLION v. NORTHWESTERN TELEPHONE EXCH. CO.

(Circuit Court of Appeals, Eighth Circuit.    August 21, 1911.)

No. 3,466.

1. TELEGRAPHS AND TELEPHONES (§ 10*)—RIGHTS IN STREETS—CONSENT OF MUNICIPALITY—LIMITATION OF FRANCHISE.

Under Const. S. D. art. 10, § 3, which provides that "no telephone line shall be constructed within the limits of any village, town or city without the consent of its local authorities," a city may grant its consent to the construction of such a line on such terms and conditions as it chooses to impose, including a limitation of the term of the franchise.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 6; Dec. Dig. § 10.*]

2. MUNICIPAL CORPORATIONS (§ 120*)—CONSTRUCTION OF ORDINANCES—EXTRINSIC EVIDENCE.

The meaning of municipal ordinances, like that of other legislative acts, must be ascertained from their language; and the private and undisclosed views of members of a city council cannot be received, years after an ordinance was passed, and after litigation has arisen, to explain its scope or qualify its meaning.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 274–280; Dec. Dig. § 120.*]

3. TELEGRAPHS AND TELEPHONES (§ 10*)—GRANT OF FRANCHISE—CONSTRUCTION—"TELEPHONE LINE."

The words "telephone line," in a resolution granting the right to a company to construct a telephone line within and through a city, cannot be construed to limit the grant to the construction of a single throughline, to the exclusion of an exchange.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Dec. Dig. § 10.*

For other definitions, see Words and Phrases, vol. 8, p. 6899.]

4. TELEGRAPHS AND TELEPHONES (§ 10*)—RIGHTS IN STREETS—CONSTRUCTION OF GRANT.

A resolution of a city council, granting to a company engaged in constructing and operating through telephone lines and local exchanges the right "to occupy the streets, alleys, and public grounds within said city for the purpose of placing therein its poles, wires, and fixtures, constituting its telephone line within and through said city," reserving to the city the free use of its poles for fire alarm and police wires, embraced the right to construct and operate a local exchange; and, there being no limitation of the term of the grant, the company, which afterward purchased an existing exchange, was not bound by a limitation in the franchise under which such exchange was constructed.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Dec. Dig. § 10.*

Rights of telegraph and telephone companies to use of streets, see notes to Southern Bell Telephone & Telegraph Co. v. City of Richmond, 44 C. C. A. 155; City of Owensboro v. Cumberland Telephone & Telegraph Co., 99 C. C. A. 14.]

Appeal from the Circuit Court of the United States for the District of South Dakota.

Suit by the City of Vermillion against the Northwestern Telephone Exchange Company. Decree for defendant, and complainant appeals. Affirmed.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

189 F.—19

Thomas Sterling (Jason E. Payne, City Atty., on the brief), for appellant.

J. O. P. Wheelwright and Charles P. Bates (E. A. Prendergast, Cobb & Wheelwright, and John I. Dille, on the brief), for appellee.

Before ADAMS and SMITH, Circuit Judges, and AMIDON, District Judge.

AMIDON, District Judge. Complainant and appellant, the city of Vermillion, S. D., on the 5th day of September, 1895, passed an ordinance granting to W. A. Cotteral and others, their successors and assigns, for a period of 10 years, the right to construct and maintain upon the streets and public grounds of the city, poles, wires, and fixtures proper and necessary for supplying to its citizens communication by telephone, subject to the usual police regulations as to the height and location of poles, etc. Under this ordinance the grantees erected a local telephone exchange.

On the 16th day of August, 1897, the city at the instance of the appellee, the Northwestern Telephone Exchange Company, passed the following resolution:

"Resolved by the mayor and city council of the city of Vermillion, South Dakota, that the right, privilege, and authority is hereby given, (———) granted to the Northwestern Telephone Exchange Company, its successors and assigns, to occupy the streets, alleys, and public grounds within said city for the purpose of placing therein its poles, wires, and fixtures, constituting its telephone line within and through said city, provided that the location of said poles and wires and fixtures shall be designated by the street committee of the city of Vermillion, with the understanding that all the costs of printing ordinances and otherwise, if any, shall be paid by said telephone company, and provided that all wires be at least 25 feet from the ground, and that the city of Vermillion may have the free use, if desired, of their poles for fire alarm and police wires, subject to the approval of said N. W. Tel. Ex. Co., said poles to be painted a uniform color and so set as not to interfere with public travel on said streets, and shall be set a uniform distance from the street line. The privilege granted under this resolution shall not be exclusive."

At the time this resolution was passed the Northwestern Telephone Exchange Company was engaged in constructing a long-distance line from Sioux City, Iowa, to Yankton, S. D., passing through Vermillion, and one of the objects of the resolution was to obtain authority from the city to use the necessary streets for this through line. Mr. Wainman, the executive officer of the company, however, testifies that at that time the local telephone exchange in Vermillion was owned by a rival company, with headquarters at Sioux City, Iowa, and that it was the intention of his company to erect a local exchange in competition therewith as soon as the toll line was completed. At about that time the Sioux City company became financially involved, and entered upon negotiations with the Nebraska Telephone Company, with headquarters at Omaha, for the sale of its property, including the local exchange at Vermillion, to that company. These negotiations resulted in a sale some time during the year 1898. The Nebraska Company being, like the Northwestern Company, a licensee of the American Bell Company, the motive for erecting a

local exchange at Vermillion by the Northwestern Company ceased. Arrangements were at once made for connection with the local exchange by the Northwestern Company, and a short time afterwards negotiations were commenced which resulted, in the year 1900, in the transfer of the local exchange at Vermillion from the Nebraska Company to appellee. It was these negotiations and transfers which Mr. Wainman testifies caused his company not to erect a local exchange at Vermillion under authority of the resolution above quoted.

The 10-year period prescribed by the Cotteral franchise expired on the 5th day of September, 1905. The city, claiming that appellee, as purchaser of the local exchange, held it subject to that limitation, insisted that its right to use the streets for its wires and poles would cease at the end of the period. Negotiations were entered upon looking to the passage of a new ordinance, but the parties were unable to come to terms which were mutually satisfactory. Finally the city passed a resolution requiring the company to remove its poles and wires from the streets, and, the company having expressed its purpose not to comply with this resolution, the city brought the present suit to have the telephone system of the defendant declared to be a nuisance, and the defendant ordered to remove the same from the streets. The telephone company filed a cross-bill, in which it set up facts by which it claimed the right to maintain its local exchange without any further grant from the city. The trial court dismissed the bill, and entered a decree upon the cross-bill, adjudging that the defendant is entitled to maintain and operate its telephone system within the limits of the city, subject only to its police power. The present appeal seeks a review of that decree.

The case involves, not only the acts of the city council above set forth, but also certain statutes of South Dakota, and one provision of its Constitution. Section 554 of the Civil Code of the state reads:

"There is hereby granted to the owners of any telephone lines operated in this state * * * the right to use public grounds, streets, alleys and highways in this state subject to control of the proper municipal authorities as to what grounds, streets, alleys or highways said lines shall run over or across, and the place the poles to support the wires are located."

Section 1229 of the Political Code of the state, being part of the chapter providing for the organization of cities, vests the city council with power "to regulate and prevent the use of streets and public grounds for telegraph and telephone poles." Section 3 of article 10 of the state Constitution provides:

"No telephone line shall be constructed within the limits of any village, town or city, without the consent of its local authorities." •

[1] Upon these statutes alone telephone companies would possess a franchise to stretch their lines in streets subject only to the police power of the city: but the Constitution imposes an important limitation upon that right. Counsel for appellee contends that the consent of the city is confined by the Constitution to the "construction" of a telephone line, that the franchise to use the streets is derived from the state, and that it was not competent for the city to limit the privilege to a term of 10 years, as was attempted in the Cotteral ordi-

nance. We cannot accept this position. The Constitution vested the city with an absolute discretion as to the terms upon which it. would give its consent. A limitation of the period for which the privilege should be enjoyed was not only within the provision of the Constitution, but was also justified by the highest wisdom as a proper protection of the rights of the city in its streets. Such limitations are at the present time a prominent feature of sound municipal action. This has been the uniform interpretation of similar constitutional provisions. City of Allegheny v. Millville, etc., Ry. Co., 159 Pa. 411, 28 Atl. 202; Mayor v. Houston Street Railway Co., 83 Tex. 548, 19 S. W. 127, 29 Am. St. Rep. 679; People v. O'Brien, 111 N. Y. 1, 18 N. E. 692, 2 L. R. A. 255, 7 Am. St. Rep. 684. The Supreme Court of South Dakota has thus construed its Constitution. Speaking of that subject in City of Mitchell v. Dakota Central Telephone Co., 127 N. W. 582, 584, the court says:

"It is quite apparent from this section of the Constitution that there is reserved to the municipality the right to grant or refuse to grant to telephone companies the privilege or franchise for establishing a telephone system within the municipality, and that it necessarily follows that, if it had the right to refuse to grant such franchise or privilege, it necessarily has the right to grant the same upon such terms and conditions as it may choose to impose, and, if the telephone company accepts the conditions, they become binding upon the company."

This construction is, of course, binding upon us.

The right to use the streets, which the statute purports to give, being conditioned by the Constitution upon obtaining the consent of the municipal authorities, the source of the beneficial right would seem to be the city rather than the state. Speaking of such a situation, the Circuit Court of Appeals of the Seventh Circuit, in Andrews v. National Foundry & Pipe Works, 61 Fed. 782, 788, 10 C. C. A. 60, 66, says:

"But, though capable of receiving, it could acquire no complete or effective right or franchise without the consent, and there is no impropriety, legal or verbal, in saying without the grant, of the city. The ultimate source of such franchises in all cases being the state, the difference between municipal power to grant them and authority to consent to the exercise of them is a difference of words rather than of substance. The language of the Court of Appeals of New York in the case of People v. O'Brien, 111 N. Y. 1, 18 N. E. 692 [2 L. R. A. 255, 7 Am. St. Rep. 684], is pertinent: 'This right, under the Constitution, could be acquired only from the city authorities, and they could grant or refuse it at their pleasure. The Constitution not only made the consent of the municipal authorities indispensable to the creation of such a right, but, by implication, conferred authority upon them to grant the consent upon such terms and conditions as they chose to impose.' So, here, not by reason of a constitutional provision, but by statute, the ultimate efficient right could be acquired only by act and consent of the city authorities, which they could grant or refuse at their pleasure."

Such, also, was the issue before the Supreme Court in the important case of Blair v. Chicago, 201 U. S. 400, 26 Sup. Ct. 427, 50 L. Ed. 801. There the state of Illinois granted to a street railway the right to construct, maintain, and operate a single or double track railway in the city of Chicago, and in and along the streets, highways, and bridges of the city, upon such terms and conditions as the city

should prescribe. It was urged by the street railway companies that the franchise to lay and maintain their lines in the streets was derived from the state, and that the city was confined to their regulation under its police power, and that it was not open to the city to limit the period during which the franchise should be enjoyed. There were amendatory statutes which gave such color to this contention as to convince the lower court and lead to a powerful dissenting opinion, in which three justices of the Supreme Court united. The court, however, refused to adopt the construction urged by the railroad companies. It sums up its views on the subject at 201 U. S. 458, 26 Sup. Ct. 439 (50 L. Ed. 801), as follows:

"The act under consideration nowhere assumes to fix the duration of the grant, nor excludes the conclusion that it is embraced in the 'terms and conditions' which are to be fixed by contract with the city. If the franchise to use the streets, without regard to municipal action, was fully conferred by the legislative act under consideration, then the company had only to take possession of the streets, subject to regulations as to the running of the cars, etc., by the city council. On the contrary, under the terms of this act, the city, by withholding its consent, could prevent the use of the streets by the corporations. No way is pointed out by which this consent could be compelled against the will of the council. That body might, for reasons sufficient to itself, under the terms of this act, by withholding assent, determine that it was undesirable to have the corporations in control of the use of the streets. * * * What, then, was conferred in the franchise granted by the state? It was the right to be a corporation for the period named, and to acquire from the city the right to use the streets upon contract terms and conditions to be agreed upon. The franchise conferred by the state is of no practical value until supplemented by the consent and authority of the city council."

The same view is adopted by the Court of Appeals of New York in Ghee v. Northern Union Gas Co., 158 N. Y. 510, 513, 53 N. E. 692, 693, where it is said:

"The legal effect of the consent, therefore, is the same as if the local authorities in form granted the franchise."

We are of the opinion, therefore, that the limitation contained in the Cotteral ordinance was valid; and, if the company's right to occupy the streets was confined to that ordinance, the decision of the trial court was wrong.

This brings us to the resolution of August 16, 1897. Upon its interpretation the case turns. If it grants the consent of the city to the defendant to place a local exchange in its streets, the decree should be affirmed; otherwise, it should be reversed.

[2] Counsel for the city urges that extraneous evidence should be received to show that the resolution was intended to cover a through line only. But the meaning of municipal ordinances, like other legislative acts, must be ascertained from their language. The record of debates in Congress is official and contemporaneous with the acts to which they relate, and yet they "are not appropriate sources of information from which to discover the meaning of the language of a statute passed by that body." U. S. v. Trans-Missouri Freight Ass'n, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007. Much less can the private and undisclosed views of members of a city council be received, years after an ordinance is passed, and after litigation has

arisen, to explain its scope or qualify its meaning. We must, therefore, find the meaning of this resolution in its language alone.

[3] Counsel first says that the word "line" fairly indicates that the resolution was confined to a single through line, instead of a local exchange. No reasonable support can be found for such an interpretation of the word "line" when used in such expressions as telephone or telegraph line. In popular language the word has a generic meaning. We get its true significance in such phrases as "Great Northern Railway Line," "Northwestern Line," "Merchants' Dispatch Line," "White Star Line." In the Constitution of South Dakota the term is used in the same sense. Section 3 of article 10:

"No telephone *line* shall be constructed within the limits of any city without the consent of its local authorities."

The same use occurs in numerous statutes of South Dakota and other states. It cannot fairly be said, therefore, that the expression "telephone line," in the resolution restricts the grant to a through line. This language is equally appropriate to a telephone exchange.

[4] There are three features of the resolution which, in our judgment, make its language fairly embrace a local exchange:

(1) It grants to the Northwestern Telephone Exchange Company, its successors and assigns, the right "to occupy the streets, alleys, and public grounds within the said city for the purpose of placing therein its poles, wires, and fixtures." If it had been the intent of the resolution to restrict the grant to a single line through the city, the resolution would much more appropriately have specified the particular street or streets along which the single line should be erected.

(2) The grant is for a telephone line "within and through said city." Naturally counsel for the city says that "within" can be given no significance; that it should be rejected, and the resolution construed as if it read a telephone line through said city. No reason is given why the word "within" should be rejected, except that its presence militates against the construction desired. But it is the duty of courts, in ascertaining the meaning of statutes and ordinances, to give effect to every word which they contain, unless there is a clear and imperative necessity to reject a part of the language in order to give effect to the plain meaning of the entire statute or ordinance. In the present case no such necessity is shown. At the time this resolution was passed, the Northwestern Telephone Exchange Company was engaged in the business of operating local exchanges as well as through lines. In fact, at that time the necessity for local exchanges at important points as adjuncts of a through line was beginning to be appreciated, and has since become a well-recognized feature of the telephone business. In no other way can the through line be effective. Customers in large towns cannot be troubled to go to toll offices every time they wish to use the long-distance telephone. Under existing close commercial and social relations, it is often quite as important that business men be enabled to communicate from their offices with other cities and towns, as it is for them to communicate with business establishments in their own city. So imperative is this necessity that

in many cities dual exchanges have been established for that purpose. Great as are the objections to such a dual system of telephones, the practice has been too general to justify the rejection of the plain language of the resolution here under consideration solely upon the ground that Vermillion was already supplied with one local exchange, and it could not, therefore, have been the intent of the parties that another local exchange should be established.

(3) The resolution further provides "that the city of Vermillion may have the free use, if desired, of their poles for fire alarm and police wires." This language clearly indicates that a local exchange was to be established. The use of the poles of a through line would have been of no advantage for the purposes of fire alarm and police wires.

In our judgment, therefore, the resolution of August 16, 1897, expresses the consent of the city to the construction and maintenance of a local exchange. Under its terms the appellee could have erected such an exchange. Instead of doing so, it purchased the one which was already in existence. It has, of course, with respect to the lines so acquired, every right which it would have possessed if it had constructed the exchange itself. The wires and poles became its property. If no resolution had been passed, the Northwestern Company, in acquiring the property, would have taken it subject to the limitation of the Cotteral franchise. But having itself an unrestricted right to place wires and poles in the streets for a local exchange, it may use the property freed from the restriction under which it was originally placed in the streets.

This construction does not vest the company with a perpetual franchise. Under section 12 of article 6 of the state Constitution, its rights are at all times subject to legislative action, and there are possibly other limitations. Omaha Electric Light & Power Co. v. City of Omaha, 179 Fed. 455, 102 C. C. A. 601.

The decree is affirmed.