Matthew M. Levy, J.
The plaintiff was the owner of certain heavy-duty machinery and equipment known as aircraft cargo *888 loader systems. The defendant was and is a common carrier, engaged in interstate commerce, as a household goods mover, operating within the authority of, and the rates specified in, Tariff 78-B of the Household Goods Carriers Bureau, on file with the Interstate Commerce Commission. In May or June of 1961, the defendant entered into a contract with the plaintiff by which the defendant agreed to transport a system from the plaintiff’s plants in Stamford, Connecticut, and Brooklyn, New York, to Fort Story in Virginia. Accessory display panels and two tables were included in the shipment. The purpose was to give the plaintiff’s personnel at Fort Story an opportunity to present a demonstration of the machinery and equipment to the United States Department of Defense and to military officials there, so as to facilitate the plaintiff’s bidding on, and negotiations with the government for, a contract as part of what was called “ Project Mobility ”.
The plaintiff did not learn until quite late of the date (June 2) scheduled for the presentation and it was therefore rushed in preparing the equipment for transportation and wished to use the quickest means readily available. In normal circumstances, the shipment could or would have been crated and sent by general carrier. However, in this situation there was insufficient time to assemble and to crate. The shipment therefore required a padded van for its exclusive use. This method of transportation would also save delay by way of stopover. The plaintiff was informed that the defendant could supply such a vehicle on June 1, which could reach Virginia on the morning of June 2, in time for the demonstration scheduled for that afternoon. Ordinarily, the service of a household goods carrier includes an experienced staff to remove the shipment from its present premises and to place it in a new location. But, in this instance, the plaintiff was so pressed for time that it had to have its own employees load the equipment at Stamford and it had to have men available at Fort .Story to unload and set up the equipment. These arrangements were carried out but, en route, early in the morning of June 2, the van and another vehicle collided, caught fire, and as a result the shipment was, for all intents and purposes, destroyed.
The plaintiff brought this suit against the defendant for damages amounting to the full value of the machinery and equipment, $30,679.39. The defendant claims that its liability is limited to 30 cents per pound, or, on the basis of a weight of 7,060 pounds, to $2,118. The figures as to weight and value were stipulated by the parties, and the remaining issues — of fact and law — were submitted to me for disposition after trial on a non- *889 jury basis. The service and filing of findings of fact and conclusions of law were duly waived.
As a common carrier, the defendant 11 is liable for all loss or injury not due to the act of God or the public enemy, the inherent nature or qualities of the goods, or the act or fault of the owner or shipper * * *. Where the loss is not due to the excepted causes, it is immaterial whether the carrier was negligent or not, and the carrier cannot escape liability by proving reasonable care and diligence, or by showing that there was no negligence ” (13 C. J. S., Carriers, § 71, p. 132). In short, the carrier is an insurer, and unless there was due limitation of liability, the carrier is liable as such.
Tariff 78-B incorporates what is known in the industry as a “ released rates order ”, whereby the carrier was permitted to limit its liability provided that it had offered the shipper the choice of requiring the carrier to assume full liability if a higher rate were to be paid the carrier for the transportation. The defendant asserts that the plaintiff accepted the limitation of liability in return for a lower rate, as provided in the tariff. The plaintiff disputes this factually and counters legally that the shipment was not of such a nature as to come within the tariff, and that therefore the defendant is liable for its full value.
At the outset, it is to be noted that the defendant’s allegation of limited liability is an affirmative defense, pleaded by the defendant in its answer, and that the burden is upon the defendant to show that the claimed limitation was in effect on this shipment (Farmers’ Loan & Trust Co. v. Siefke, 144 N. Y. 354, 360; Blunt v. Barrett, 124 N. Y. 117, 119; Moncel Realty Corp. v. Whitestone Farms, 188 Misc. 431, 433, affd. 272 App. Div. 899).
The type of shipment allowed household goods carriers is contained in the tariff itself, and is expressed in the following commodity description (Tariff 78-B, p. 21, item 100):
“ (1) PERSONAL EFFECTS AND PROPERTY USED OR TO BE USED IN A dwelling when a part of the equipment or supply of such dwelling. [Moving households]
“ (2) FURNITURE, FIXTURES, EQUIPMENT AND THE PROPERTY OF STORES, OFFICES, MUSEUMS, INSTITUTIONS, HOSPITALS, OR OTHER establishments when a part of the stock, equipment, or supply of such stores, offices, museums, institutions, hospitals, or other establishments. [Moving business to new location.]
“ (3) ARTICLES INCLUDING OBJECTS OF ART, DISPLAYS, AND exhibits, which because of their unusual nature or value require specialized handling and equipment usually employed in moving *890 household goods.” [Catchall — • where this specialized carrier could best perform.][1]
Concededly, nothing in subdivisions (1) or (2) could fit the instant case, but the defendant asserts that it was informed by the plaintiff that the shipment here involved consisted of displays and exhibits and therefore falls within subdivision (3).
In my view, the defendant’s statement of fact is erroneous and its contention on the law is fallacious. The shipper’s property was bulky machinery designed for practical industrial use, and the fact that it was to be displayed or exhibited to the military was merely incidental and did not convert the equipment into a mere ‘ ‘ display or exhibit ’ ’ within the meaning of the tariff. Throughout, it remained ‘ ‘ machinery, ’ ’ an item which does not fit into subdivision (3). That the defendant constantly refers to the equipment transported as a “ display or exhibit ” has no greater efficacy than the assertion of the fictional Bellman that “ What I tell you three times is true ”.[2] My conclusion, I think, is supported by applicable determinations of the Interstate Commerce Commission and by relevant rulings of a number of courts.
The purpose of the tariff is to limit a carrier’s operations to its specialized area, so that it does not infringe on the service and business of other (e.g., nonhousehold goods) carriers. Accordingly the commission has held general merchandise and equipment not to be within the “ Commodity Description ” of 78-B. (Matter of Neptune Stor. Extension, 7 Fed. Carr. Cases 683 [1950] and Blanchard Stor. Co., 7 Fed. Carr. Cases 194 [1949].)
The commission has resisted any broadening of subdivision (3) of item 100 of the tariff, and indeed has strictly limited its applicability. In Matter of MG-19, [1951] 8 Federal Carriers Cases 311, the commission had before it for determination a request by household carriers to expand subdivision (3) of item 100 so as to include any uncrated shipment, or any goods for which a shipper requests the use of a household carrier to transport. The commission expressed the issue and its ruling as follows (at pp. 311-312): ‘1 Petitioners would construe part 3 of the definition to include any uncrated article which is tendered to a household goods carrier for transportation. Such a construction is not warranted by the language of the definition. The *891 Household Hoods Carriers’ Conference upon exceptions repeatedly contends that its construction of part 3 of the definition is not that household-goods carriers may transport any uncrated article but only uncrated articles which require the specialized handling and equipment usually employed in moving household goods. And the controlling test of whether an uncrated article requires specialized handling and equipment usually employed in moving household goods, according to this party, is the opinion of the shipper. As a practical matter, then, if a shipper tenders for transportation any uncrated article to a household-goods carrier such article would be deemed to require specialized handling and equipment usually employed in moving household goods. Under these circumstances it is plain that petitioner’s real position is, as stated, that respondents may transport any uncrated article, as clearly, they can transport property only when it is offered for transportation. ’ ’
After reviewing the definitions of the type of service household goods carriers provided, the commission disagreed with the petitioners’ position, rejected their request, kept the definition intact and refused to broaden the rule’s interpretation.
The findings of the commission were set forth as follows (p. 317): “Interpretations — Use to narrow or enlarge rights prohibited. The primary purpose in seeking a modification or construction of rule 1(a) which would encompass nearly all uncrated commodities is to broaden the type of service that may be rendered by carriers holding authority to transport household goods. As seen, the definition is clear, reflects the intent of the Commission, and adequately embraces all the types of service which are the proper functions of carriers of household goods. Interpretations of clear language may not be made to narrow or enlarge certificated rights. See United States v. Seatrain Lines, 329 U. S. 424.” And the commission concluded that, if a carrier desired broader authority, he should — as was done in the past — file a new application specifying the additional authority sought, but that subdivision (3) of item 100 could not be construed to mean whatever the shipper wanted it to mean in any particular instance.[3]
*892 That the shipper desired the services of a household goods carrier or that the shipper did not wish to crate the equipment would not warrant classifying the shipment as a household goods transportation. Thus in the Matter of Neptune Stor. Extension (7 Fed. Carr. Cases, 683, 684, supra) the commission said: 4 4 Although the facilities of household goods carriers may be better suited for the transportation of tabulators, it has not been established that the tabulators are of such unusual nature or value as to require the specialized handling and equipment usually employed in moving’ household goods.”
And in the Matter of Blanchard Stor. Co. (7 Fed. Carr. Cases 194, supra) referring to certain 4 4 office furniture ’ ’ and the crating thereof (or lack of it) for transportation, the commission said (pp. 194-195): 44 The articles manufactured by Recordak have been handled, in crates, by rail and by general commodity motor carriers but the shipper prefers to have them moved uncrated. It has not been shown that these commodities are of such unusual nature or value as to require specialized handling and equipment usually employed in moving household goods. In the circumstances, we conclude that they are not within class (3) of the household goods definition ”.
Similarly in the instant case, the defendant has not established that the shipment was of such unusual nature or value as to require its specialized handling and equipment, so as to come within the categories of goods encompassed by Tariff 78-B. Only if a specific finding of special value or nature is made, could an item be moved by a household goods carrier pursuant to Tariff 78-B, even if such item is labeled a 44 display”.’ (See Interstate Commerce Comm. v. United Van Lines, 110 F. Supp. 273 [E. D. Mo.] where the I. C. C. sought an injunction against a motor carrier of household goods to prevent the shipment of various items as 44 household goods ”.)
The defendant points out that subdivision (3) of item 100 in Tariff 78-B specifically includes 44 objects of art, displays, and exhibits ”. That is so, but I hold that because the equipment here was intended upon arrival to be shown by way of demonstration to the military does not transform it into an object of art, display or exhibit. It remained what it was — massive machinery,
Even a bona fide work of art, display or exhibit must have something unusual about it to necessitate the use of a household mover and to fall within its tariff. To come within the purview of the tariff, the shipment must still be such as intrinsically to 4 4 require ’ ’ special care. The express and plain language of the tariff in that respect cannot be overlooked or ignored. The *893 defendant has not shown anything “ unusual ” about the machinery’s “nature or value [as] to require specialized handling and equipment usually employed in moving household goods ”, as provided by the express language of the tariff. I also hold that the subsidiary demonstration material which went along with the loader did not change the nature of the shipment, for, even if it was a display, the articles in this instance did not require — as I find the fact to be — any specialized service or handling offered by household movers.
The conclusion is inescapable that speed was the governing factor which determined the plaintiff’s choice of a carrier and while it is true that use of a padded van for plaintiff’s sole needs was required, these services could have been obtained from other and general carriers. Although I fully realize that the words “ household goods ”, as used in the tariff here involved, are a term of art, and are not limited to goods that are normally used in areas of personal domesticity, it is equally clear to me that expedition and exclusiveness are not factors which change the basic nature or value of the material from machinery to that of “ household goods ” within the meaning of the tariff.
The defendant has advanced the contention that its service was. requested by the plaintiff and that therefore the shipper’s needs were a predetermination showing that the defendant was authorized, pursuant to the tariff, to carry the plaintiff’s machinery. This argument was directly answered in the negative in Matter of M C — 19 (8 Fed. Carr. Cases 311 supra) because there this type of service was specifically excluded from the coverage of the tariff. Thus it must be concluded that the tariff commodity description did not encompass the services which were provided in the instant case.
Since I have held, as hereinbefore stated, that the goods shipped were not within the tariff and operating authority of the defendant, the next question to be resolved is whether the defendant’s liability is nevertheless limited by the terms of the contract between carrier and shipper as embodied by the bill of lading.[4] Also, the defendant has put forward the further argument that, since the plaintiff had accepted a released value of *894 30 cents a pound, it is now estopped from claiming any higher value. These points may be disposed of together. But, first, let me say that I recognize that, in case of fraud on the part of the shipper, the carrier might, in appropriate circumstances, gain the benefit of the limitation in the valuation of the shipment. (See dicta in Atchison, Topeka & Santa Fe Ry. Co. v. Robinson, 233 U. S. 173, 180, 181; Great Northern Ry. Co. v. O’Connor, 232 U. S. 508, 515-516; Ellison v. Adams Express Co., 245 Ill. 410.) Here, however, it should be recorded that I find, on the facts, that it was made clear to the defendant before its commitment to carry was undertaken that the plaintiff needed a van large enough to transport heavy-duty machinery — not a delicate or fragile instrumentality, easily susceptible of damage in ordinary freight service (see Interstate Commerce Comm. v. United Van Lines, 110 F. Supp. 273, 276, supra); and, since the equipment was uncrated, the defendant’s driver knew the character of the material being shipped. Certainly, this is not a case where the plaintiff, in order to obtain a lower rate, concealed the nature or value of the shipment (see dissent in Grace & Co. v. Railway Express Agency, 8 N Y 2d 103, 107-109, infra, per Dye and Van Voorhis, JJ.).
The authority for limitation of liability of an interstate common carrier is contained in subdivision (11) of section 20 of title 49 of the United States Code, as follows, insofar as applicable to the instant controversy: ‘ ‘ Liability of initial and delivering carrier for loss; limitation of liability; notice and filing of claim. Any common carrier, railroad, or transportation company subject to the provisions of this chapter receiving property for transportation from a point in one State * * * to a point in another State * * * shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage or injury to such property caused by it * * * and no contract, receipt, rule, regulation, or other limitation of any character whatsoever shall exempt such common carrier, railroad, or transportation company from the liability imposed; and any such common carrier, railroad, or transportation company so receiving property for transportation * * * shall be liable to the lawful holder of said receipt or bill of lading or to any party entitled to recover thereon, whether such receipt or bill of lading has been issued or not, for the full actual loss, damage, or injury to such property caused by it * * * notwithstanding any limitation of liability or limitation of • the amount of recovery or representation or agreement as to value in any such receipt or bill of lading, or in any contract, rule, *895 regulation or in any tariff filed with the Interstate Commerce Commission; and any such limitation, without respect to the manner or form in which it is sought to be made is declared to be unlawful and void * * *. Provided, however, That the provisions hereof respecting liability for full actual loss, damage, or injury* notwithstanding any limitation of liability or recovery or representation or agreement or release as to value, and declaring any such limitation to be unlawful and void, shall not apply * * * to property * * * received for transportation concerning which the carrier shall have been or shall be expressly authorized or required by order of the Interstate Commerce Commission to establish and maintain rates dependent upon the value declared in writing by the shipper or agreed upon in writing as the released value of the property, in which case such declaration or agreement shall have no other effect than to limit liability and recovery to an amount not exceeding the value so declared or released ”.
As clearly as possible, the foregoing statute states a broad general rule of full liability of the common carrier in interstate commerce, and it then excises a specific area of permissible limitation. It is only where the commission has approved a released rates schedule for inclusion in the commission’s tariff, suchas the Household Goods Carriers Conference tariff, that liability can be limited.
The only category of shipment for which the commission has authorized released rates as regards this defendant is that of “ household goods ”. But, as has been held, the plaintiff’s shipment has not been, and cannot be, shown to fall within this category (Tariff 78-B, item 100). Thus the defendant is left without an applicable released rate order. Therefore, as will be explained hereinafter, the uniform bill of lading, purporting to limit liability, is of no force and effect in the instant case and is not binding on the plaintiff so as to limit its recovery.
Nor is there an estoppel. The contractual bill of lading and the practical imposition of an estoppel might be relied upon by the defendant if it had undertaken to carry and was transporting a shipment which was within its applicable operating authority. It is a correct — but only partial — statement of the relevant law, as put by the defendant and the cases cited by it, that if the plaintiff had accepted a released value of 30 cents a pound, it is now estopped from claiming a higher value. Indeed, that is the very import of subdivision (11) of section 20 of title 49 of the United States Code. However, the defendant overlooks the *896 further and important factor that, in every case so cited,[5] &there was the finding, express or implied, not alone of such agreement on the part of the shipper, but also that the tariff used in each instance was applicable and that there was in fact no deviation therefrom. The plaintiff’s knowledge of the tariff structure, as claimed by the defendant, is therefore not germane.
Although it is an Appellate Term decision, and therefore not per se binding upon me, a case which appears to me to be in point is that of Elgart & Sons v. Peoples Express Co. (11 Misc 2d 499). In a Per Curiam opinion, the court there said: ‘ ‘ The plaintiff shipper declared a released value of the property of $50. Such released value, however, could only apply to that property concerning which the defendant carrier had been authorized to establish and maintain rates dependent upon value. The defendant did not petition for and the order of the Interstate Commerce Commission did not authorize it to establish and maintain rates for clothing made of wool. The released rates order specifically limits the classification of the merchandise on which the defendant can release liability to celanese and rayon fibres, yarns and fabrics, silk, mixtures of the foregoing and finished and unfinished products thereof. When, therefore, the defendant accepted the shipment of the wool clothing with a released value, it deviated from the order of the commission and from its filed tariffs established under the authority of that order. The contract of carriage in the circumstances was invalid and unenforcible. The plaintiff, moreover, is not estopped, having accepted the benefit of the lower rate, for any such limitation of liability ‘ without respect to the manner or form in which it is sought to be made is declared to be unlawful and void. ’ (U. S. Code, tit. 49, § 20, subd. [11]; New York & Honduras Rosario Min. Co. v. Riddle Airlines, 3 A D 2d 457.) ”
The Appellate Term relied in part on New York & Honduras Rosario Min. Co. v. Riddle Airlines (3 A D 2d 457, affd. 4 N Y 2d 755). There, defendant, a connecting air carrier, violated its established tariff by transporting certain bullion at a reduced *897 value, which it was required to carry at actual value. The court held the carrier liable for full value on the lost shipment. As said by the Appellate Division (pp. 461-462): “ The deviation from the filed tariff rates that occurred when Biddle [the carrier] accepted the bullion for carriage under the terms set forth in the airway bill is prohibited. An air carrier is specifically prohibited from charging or receiving a greater, less or different rate than those specified in its concurrently effective tariffs. ’ ’[6]
Additionally, the court said (p. 463): “ When it [the carrier] accepted the shipment with a released value, it deviated from its tariff. Such a deviation is discriminatory. This renders ineffectual the released value fixed in the airway bill and Biddle’s liability is that of an insurer” (see, also, American Tobacco Co. v. Whitney, 291 Ky. 281).
Similarly, in Grace & Co. v. Rqihoay Express Agency (8 N Y 2d 103, supra) the court held that, because the carrier deviated from its filed tariff, limitation of liability was lost. The Court of Appeals stated (p. 105): “ The Appellate Division opinion cited the settled rules that unless a shipper be given a choice of rates an interstate carrier cannot limit its liability to less than the true value, that a carrier cannot charge or receive a rate different from that specified in its currently effective tariff, and that it is the regulatory scheme of the Interstate Commerce Act (U. S. Code, tit. 49, § 1 et seq.) which governs, not the common law. ’ ’
Departure by the carrier from a filed tariff is fatal to a claim of limitation, and, even if the shipper bears some responsibility for the deviation, the carrier is nevertheless held to full liability. As stated by the Court of Appeals in the Grace case {supra, p. 107): “ The applicable law plainly states that neither the character of service nor the rates could validly be changed from those expressed in the tariffs.”[7]
The fact that the shipper might have desired the carrier to ship the cargo loader as a “ display or exhibit ” is no bar to the plaintiff’s recovery. As was made plain in the Grace case (8 N T 2d 103, 106, supra) if the carrier knew, even throug’h its agent such as the driver, the true nature and contents of the shipment, this circumstance defeats any claim by the carrier that there was a misdescription on the part of the shipper.
The United States Supreme Court, in an analogous situa *898 tion, has enunciated the rule that, unless an applicable released rate is on file, the carrier bears full liability. In New York Cent. R. R. Co. v. Goldberg (250 U. S. 85) the court rejected the carrier’s claim that an innocent misdescription by the shipper would result in the carrier having no responsibility for loss. Since there was no clause in the bill of lading limiting liability, the carrier was held liable for full vaue. The mistake merely imposed on the shipper the duty to pay the proper rate (p. 87), and he was not penalized by the imposition of a limit on the liability of the carrier. In the case at bar section 3 of the defendant’s tariff form bill of lading (reverse side) provides for such payment. Moreover, since the defendant does not have an applicable tariff rate and since it certainly bears a share of the responsibility for the misdescription, the defendant has lost the benefit of any limitation on its strict and full liability.
It may seem inequitable, from an off-hand adversary viewpoint, for a shipper to get the benefit of a released rate and still be entitled to full coverage when the carrier is entirely innocent (which I do not, on the facts, so characterize the defendant). Nevertheless, the issue must be resolved on the basis of the broader public interest. The “ Supreme Court’s long-enunciated rule has been that the enforcement of the commerce act and the tariffs filed thereunder is paramount to the equities involved in a particular situation.” (109 Univ. of Pa. L. Rev. 606, 608-609).
Now that I have expressed my view that the defendant is liable, without limitation, for the full value of the shipment, one final point remains: Does this court have jurisdiction to render the type of determination thus indicated? Ordinarily, this issue is one which is disposed of first in the sequence of analysis. But, in the case at bar, I concluded that the factual and legal issues, if discussed and resolved at the outset, would present a clearer background for the decision as to this point.
We are, of course, dealing here with interstate commerce and thus with Federal statutes (see New England Fruit & Produce Co. v. Hines, 97 Conn. 225), and with rulings by the Federal regulatory agency concerned. In so doing and in arriving at the determination hereinabove rendered, the court has not exceeded its jurisdiction or acted beyond its competence. A State court has jurisdiction to hear a suit for damages incurred by a shipper. Subdivision (11) of section 20 of title 49 of the United States Code expressly speaks of a State court hearing such a case. Of course, the court — State or Federal — makes its decision in accordance with the applicable law.
*899 However, the defendant contends further that this court is without competence, any more than would any Federal court be, to determine whether the shipment in question was “ household goods ’ ’, without primary resort to the Interstate Commerce Commission for a ruling. This assertion, while superficially attractive, is specious as applied to the instant situation.[8]
The leading case in this field is Great Northern Ry. v. Merchants Elevator Co. (259 U. S. 285). The question presented to the court involved that of construing or applying a tariff where the Interstate Commerce Commission had not passed on the disputed question of construction. The petitioner carrier advanced the same argument as that presented by the defendant here, namely, 11 that courts are without jurisdiction of cases involving a disputed question of construction of an interstate tariff, unless there has been a preliminary resort to the Commission” (p. 290). The United States Supreme Court, speaking through Mr. Justice Brandéis said (pp. 290-291): “This argument is unsound. It is true that uniformity is the paramount purpose of the Commerce Act. But it is not true that uniformity in construction of a tariff can be attained only through a preliminary resort to the Commission to settle the construction in dispute. Every question of the construction of a tariff is deemed a question of law; and where the question concerns an interstate tariff it is one of federal law. If the parties properly preserve their rights, a construction given by any court, whether it be federal or state, may ultimately be reviewed by this court either on writ of error or on writ of certiorari; and thereby uniformity in construction may be secured. Hence, the attainment of uniformity does not require that in every case where the construction of a tariff is in dispute, there shall be a preliminary resort to the Commission.”
Only where the inquiry is essentially one of fact and of discretion as to a technical matter is such preliminary resort necessary. The construction to be given an interstate tariff ordinarily presents a question of law not differing from the construction of any other statute or regulation.
In face of this authority, the defendant relies on the proposition stated in Norge Corp. v. Long Is. R. R. Co. (77 F. 2d 312 [C. A. 2d, 1935], cert. den. 296 U. S. 616). In this case the shipper sought recovery of freight overcharges. The court stated (p. 314) the rule that: “in order to secure uniformity and avoid discrimination between shippers, resort must first *900 be had to the Interstate Commerce Commission, and in the absence of a determination by that expert body, a court is without jurisdiction to interpret the tariffs where there is a question of fact * * *. It is only where words of the tariff have an ordinary meaning only, and are employed in that sense so that their interpretation is solely a question of law, involving no issue of fact, that a court has jurisdiction in the first instance. ’ ’
In the first place the cases such as Norge are rate overcharge matters, where, as the court noted, uniformity of rate is the aim, and discrimination between shippers is the danger. Obviously, to decide such a matter a policy determination must be made. The forum for such a policy decision is the commission, not the courts. No policy determination is necessary here, however, since the commodity description has already been delineated and interpreted by the commission. Therefore the Norge holding does not apply.
In the second place, the present case falls within the second part of the Norge rule, for the words in subdivision (3) of item 100 have an ordinary meaning — and have been so interpreted by the Interstate Commerce Commission. In Matter of MC-19 (supra) the commission specifically ruled that the description was clear as a factual determination. There has been no evidence presented to me as to what classification the instant shipment should have, and it is undisputed that the shipment was machinery with pendant brochures and panels. Thus, only a question of law is here involved — does the shipment come within the commodity description of the tariff? Therefore, as was said in Norge, there is no need for preliminary resort to the commission.
The later case of Pennsylvania R. R. Co. v. Fox & London (93 F. 2d 669 [C. A. 2d, 1938]) where the dispute centered on the respective rates for aluminum scrap and metal scrap, was decided by the same court as was Norge. The court stated (pp. 670-671): “And, moreover, where the terms of the published tariff are themselves unambiguous, the issue must be resolved by reference to the rate published, treating it as established law like any plain statute, leaving only the incidental issue of applicability which is dependent only upon the fact of the nature of the commodity shipped. Properly speaking, no construction of a tariff is involved where the only controversy is whether the commodity shipped is one or another of two things plainly classified.”
The case of Fox & London, as well as the Norge case, clearly indicates that the determination in the instant case is simply *901 one of law. "Whether the shipment herein fits within item 100 of the tariff is not a policy determination so as to require the expertness of the commission. Here, it is not necessary to decide any question best suited to administrative determination. On the contrary, the court is able to determine the issues by following the established tariff and the rulings of the commission, and in so doing it is deciding a question of law.
The Congress enacts the statutes, and the Interstate Commerce Commission establishes the rules, but it is up to the courts to interpret and apply them. When a State court has jurisdiction of the person and subject matter of the controversy, it makes a determination in line with the statutes and the rules set forth and the binding legal interpretations thereof (cf. Matter of Orans, 45 Misc 2d 616, 646-647, affd. 15 N Y 2d 339). A ruling in the instant case to the effect that no limitation of liability exists will not disrupt the defendant’s operations as an interstate carrier. It will only serve notice that, to gain the benefit of the tariff, the defendant must observe the tariff. This, subdivision (11) of section 20 of title 49 of the United States Code requires.
In recognition of the court’s competence to construe the term “ household goods ”, the Interstate Commerce Commission, interestingly enough, has itself gone to the courts to enjoin shipment of what is, or is not, “ household goods.” Thus, in Interstate Commerce Comm. v. United Van Lines (110 F. Supp. 273, supra) the United States District Court was asked to and did enjoin the shipment by a household goods carrier of shuffleboards, pin-ball machines, kitchen equipment, new furniture (shipped as “ display merchandise ”) and cash registers, on the ground they were not within that tariff. On the other hand the court allowed micro-filming equipment, television equipment, office tabulators, laboratory equipment and telegraph transmission equipment as ‘ ‘ household goods ’ ’ because it found that all these articles were delicate and fragile and required special handling.
If I were to be called upon to formulate a simple phrase which would be conceptually descriptive — accurately, substantially and adequately — of the service rendered by a household goods carrier under subdivision (3) of item 100 of Tariff 78B, I would select not the ‘ ‘ desirability ’ ’ of the vehicle indicated by the shipper or supplied by the carrier, not the 1 ‘ exclusivity ’ ’ of the facility engaged, not the “ rapidity ” of the transportation envisaged, but rather the ‘ ‘ fragility ’ ’ of the class of the articles shipped in the light of their intrinsic value and the special handling required.
*902 Having jurisdiction in the premises, I hold that the plaintiff, in accordance with the stipulation of the parties and the proven facts, is entitled to judgment in the sum of $30,679.39, plus interest from June 2, 1961, together with the costs and disbursements of this action. The foregoing is my decision in accordance with the provisions of the CPLE. The Clerk is directed to enter judgment accordingly. The exhibits may be returned to the .respective parties upon due receipt therefor.

 The phrases in the brackets at the close of each subdivision are not in the tariff itself, hut are my short descriptive characterizations of the nature of the articles covered for the transportation therein indicated.

 See Martin Gardner’s “ The Annotated Snark ”, the full text of Lewis Carroll’s great nonsense epic, “The Hunting of the Snark”, Simon & Schuster, New York, 1962 ed., p. 38.

 The converse arose in Movers Conference of America v. United States (205 F. Supp. 82 [S. D. Cal., 1962]). There, the court set aside an order of the Interstate Commerce Commission, where the order — instead of merely defining or interpreting or applying the term “household goods” — had the effect of narrowing the scope of the commodity description in that it required a change of location by the shipper before a household carrier could engage in the transportation. In such ease, it was held that the commission should have followed the procedure specified in subdivision (a) of section 312 of title 49 of the United States Code, and that the failure to do so was a denial of due process.

 On the facts, I find that it was the plaintiff’s bill of lading that controlled, that there was no limitation of liability indicated therein, and that the plaintiff did not otherwise consent thereto, expressly or impliedly. However, I have undertaken to resolve the controverted issue as a matter of law, as if the defendant’s factual assertions satisfied its burden of proving the defense of limitation. (Cf. General Precision v. Burnham, Van Serv., 24 A D 2d 271, 273-274, affd. 19 N Y 2d 717.)

 General Precision v. Burnham Van Serv., 24 A D 2d 271, affd. 19 N Y 2d 717; Kaufman v. Pennsylvania R. R. Co., 47 N. Y. S. 2d 639; Kansas Southern Ry. v. Carl, 227 U. S. 639, 643; Greenwald v. Barrett, 199 N. Y. 170, 177; LaPrimadora v. Wolf Delivery Serv., 28 Misc 2d 586; Tammy Co. v. Cohen, 33 Misc 2d 373; Kaydro Fashions v. S & H Express, 236 N. Y. S. 2d 670; Barbizon Corp. y. Lock-Air Delivery, 43 Misc 2d 151; Bruce Glen, Inc. v. Emery Air Freight Corp., 24 A D 2d 145; Caten v. Salt City Movers & Stor. Co., 149 E. 2d 428; Holmes v. National Van Lines, 55 Wn. [2d] 861; Boston & Maine R. R. Co. v. Hooker, 233 U. S. 97; Louisville & Nashville R. R. Co. v. Maxwell, 237 U. S. 94; Texas & Pacific Ry. Co. v. Leatherwood, 250 U. S. 478; American Ry. Express v. Daniel, 269 U. S. 40.

 Air tariffs under the Civil Aeronautics Act are effective in that industry as are those of the Interstate Commerce Act in respect of land and water transportation (Lichten v. Eastern Airlines, 189 F. 2d 939, 941).

 See the following notes on the Grace case: 109 Univ. of Pa. L. Rev. 606 (1961); 25 Albany L. Rev. 110 (1961); and 36 Notre Dame Lawyer 202 (1960).

 For a discussion of similar problems in other areas of administrative regulation, see my opinions in State of New York v. New York Movers Tariff Bureau, 48 Misc 2d 225; Matter of Panzer v. Berman, 53 Misc 2d 122.