Matthew M. Levy, J.
By this suit, the City of New York seeks a permanent injunction restraining the defendant from ‘ ‘ continuing to occupy and make use of the City streets for the purpose of operating one or more CATV systems within The City of New York, without ever having obtained any franchise and/or consent for use of the City Streets [as] required [by Section 362 of the New York City Charter].”[1]
The charter provision referred to reads as follows: “ Powers of board of estimate.— The board of estimate shall have the control of the streets of the city, except as in this charter otherwise provided, and shall have the exclusive power in behalf of the city to grant franchises or rights or make contracts providing for or involving the occupation or use of any of the streets of the city, whether on, under or over the surface thereof, for railroads, pipe or other conduits or ways or otherwise for the transportation of persons or property or the transmission of gas, electricity, steam, light, heat or power, or the installation of transformer vaults, and to give the consent of the city to any franchise or right of any kind or nature whatsoever for or relating to the occupation or use of the streets of the city under the provisions of the constitution or of any statute.”
In the colloquial parlance of the industry, the defendant has come to be known as a cable or community antenna television (CATV) company, and that is, in adequate part, an apt technical description of its business. It is a purveyor of improved television reception and solicits subscriptions from customers at a stipulated charge, either directly from owners of individual television sets, or from landlords who, in turn, resell the service (usually at an increased rate) to their respective tenants. A *588 statement of the physical facilities employed by the defendant and of the electronic processes involved (as unfolded by the evidence presented at the trial) is needful and helpful at the very outset for a proper understanding of the issues raised in this case.
The tall buildings and other obstructions characteristic of the towering metropolis that is New York City interfere with the usual communications transmitted over the air by television broadcasting stations, causing “ signal bounce ” which distorts the ultimate image seen on the TY screen and affects the sound heard. The defendant operates an electronic system in Manhattan in aid of television reception, designed to bring clearer results to the viewers than would otherwise be obtainable from the original broadcasting sources. The defendant receives television signals or impulses from a series of nine antennae constructed on the roof of the Hotel Americana (located at Seventh Avenue and 52nd Street in Manhattan), one for each broadcasting station in the metropolitan area. By means of certain complicated and sophisticated electronic equipment, the signals are then channeled into a single coaxial cable, which runs from the roof of the Americana to the 52nd floor thereof. The signals are there picked up by a coaxial cable owned by the New York Telephone Company. There, also, the telephone company’s coaxial plug or interface point is connected to a monitoring test device, which enables the company to examine the level and quality of the signals received from the defendant. The impulses are then fed by the telephone company into another coaxial cable which runs to that company’s equipment room in the basement of the Americana, where are located another test point, a power supply unit and an amplifier. The impulses are then relayed by the telephone company through two separate cables laid and operated by that company under the city streets. One of these subsurface cables carries the signals along 'Seventh Avenue to 51st Street, thence east across 51st Street to the Avenue of the Americas (Sixth Avenue), thence north along Sixth Avenue to Central Park South (59th Street). Bn route at 54th Street and Sixth Avenue, this cable branches off in order to transmit signals to the Warwick and Dorset Hotels (located on 54th Street) and to several other buildings on that street. The second underground telephone company cable hereinabove mentioned runs from the basement of the Americana north along Seventh Avenue, where the impulses are distributed to several buildings along the way. The terminal point of this primary cable is also Central Park South. The geographical area in which the defendant presently *589 merchandises its service may be roughly described as lying between 53rd and 59th Streets from south to north, and bounded by Fifth Avenue on the east and Broadway on the west. There was some indication at the trial that the defendant may expand its operations beyond this territory.
The antennae and the cables and electronic mechanisms affixed thereto which are on and run from the roof of the Hotel Americana to and on the 52nd floor thereof were installed and are owned, operated and under the control of the defendant. The cables and electronic devices which accept the signals thus received on the 52nd floor of the Americana and the cables which relay these impulses under and through the city streets by means of underground ducts and subways to the various buildings, where they are again picked up by the defendant, were furnished by and are under the ownership, operation and control of the telephone company. In each building serviced by the defendant, it has placed a cable and other electronic appliances which receive the signals transmitted from the Hotel Americana by way of the' under-surface telephone company cables.
Precisely what that service is and the manner of operation deserve analysis at this point, particularly in respect of the technology involved in an electronic impulse or signal and the mechanics of its transmission. The key is the “ amplifier ”. In general terms, the purpose of an amplifier is to compensate for the attenuation or loss in the strength and quality of the electronic signals as they pass through a coaxial cable. And the plaintiff’s expert testified that the sole purpose of an amplification system is to maintain both the tone and quality of the original impulses. While this might hold true as a broad, general, superficial statement or concept, the witness made no attempt to describe the precise process by which an amplifier functioned, its component parts, the specific manner by which impulses are strengthened in terms of any particular action or reaction of any particular part or parts of the amplifier upon the impulses or vice versa; nor did he describe or identify the models or types of amplifiers used by the telephone company in connection with the transmission process, or show that he had acquired any particular knowledge or familiarity with these devices through use in his own work.
On the other hand, the scientific evidence presented by the defendant was buttressed by substantial proof of knowledge and experience. The amplifier in use at the Americana was shown to be a transistor type manufactured by a named electronics company. Essentially, it consists of two basic com *590 ponents — the first known as the input, and the second, the output, circuit of the amplifier. As the incoming signal enters the amplifier through the input circuit, another and distinctly separate and new impulse is created which flows into the output circuit and continues through the coaxial cable. It was made clear that the net effect of the amplifier is to take the incoming signal (which is termed an ‘[1] encoded electrical train of energy”), to destroy or dissipate that signal and to create a new such electrical train (which is a replica of the old signal) and which, in repeated procession, will ultimately be reconstructed into picture and sound of the same tone, quality and magnitude as were inherent in the video and sound signals first received from the broadcasting source.
I find, therefore, on the basis of a preponderance of the credible evidence before me, that the electronic impulses which are received at the Hotel Americana by the telephone company from the defendant are not transmitted as sustained electrical units in the cables under the city streets, but are in fact converted into new but duplicating impulses within an amplifier located on private property. I further find that, because of this “ simultaneous demise and procreation” — as I described the process at the trial[2] — these electronic impulses are new signals which were created by the telephone company through the use of its own equipment, and are then transmitted through the under-surface cables of the telephone company, and that these impulses at all times remain under the control of the telephone company until delivered by it to the defendant, again on private property. In sum, the signals which pass through the telephone company’s cables occupying the city streets are not the *591 signals which are delivered to it for transmission at the Hotel Americana by the defendant.
Although I have undertaken to resolve the foregoing issue of scientific fact and conflicting opinion on the basis of the proof presented by the parties — and have held in the defendant’s- favor because of the reasons which were hereinbefore given by me — I am of the opinion that, were my conclusion otherwise as to this, that would not require a determination on the law contrary to the one I make. As I see the jugular legal issue here, it matters not — fundamentally—what the electronic composition or the technical quality of the signals passing through the telephone company cables is. For the purpose of the remaining discussion, therefore, I shall lay aside the proof that was submitted by the parties, pro and con, as to whether the electronic signals are converted into different kinds of signals by the telephone company for transmission through its facilities to the points where they are again received by the defendant on private property, thus suggesting that the electronic impulses actually transmitted by the telephone company are of the latter’s making (as argued by the defendant) or as to whether the electronic signals through the air received by the defendant at the Americana are in fact the same signals ultimately transmitted by the defendant to its customers by means of the telephone company subsurface cables (as urged by the plaintiff). For, as I read the charter provision, what is basic is whether transmission of these impulses in any form whatsoever through the telephone company’s facilities located in the underground ducts and subways in the streets constitutes such “occupation ” or “ use ” of the streets by the defendant so as to require a franchise.
The plaintiff argues that section 362 of the charter gives “ the Board of Estimate the power to grant franchises involving the use of streets for the transmission of electricity through pipes, conduits or otherwise ”. I disagree. In my view, only an inverse reading of the language of the statute can support this contention. A proper understanding is best obtained from a reading of the relevant clause without inappropriate transposition of the language. The section establishes in the Board of Estimate the power to grant franchises “involving the occupation or use of any of the streets * * * for railroads, pipe or other conduits or ways or otherwise for the transportation of persons or property or the transmission of gas, electricity, steam, light, heat or power ’ ’. In other words — relating the language of the statute to the case at bar — the power to franchise is directed not to the use of the streets *592 for the transmission of electricity but to the use of the streets for pipe through which electricity is transmitted.
The city argues further that, even though the telephone company may have the right — under the State and city franchises and consents heretofore granted to it — to lay and maintain its cable lines in the street underground passageways and the further right in conformity with its approved tariff to offer its facilities to the defendant as a subscriber for the operation of the latter’s CATV business, that extended right cannot be relied upon by the defendant unless it has been franchised by the city Board of Estimate to utilize that service. Here, too, I disagree.
As has been hereinbefore recited, the defendant, in operating its business, utilizes properties owned by it, the private facilities of certain high-rise hotels in mid-town, as well as the street subterranean cables of the New York Telephone Company. At the present time, there are three other CATV companies in New York City engaged in the same business as the defendant, and they operate by means of their own underground cables, pursuant to municipal franchises granted by the Board of Estimate.
Under the terms of their agreements with the city, the franchised CATV companies are free to subscribe to the transmitting service of the telephone company. However, as they are also permitted to do, they have chosen instead to lay their own cables under the city’s streets. Aside from that, the technical operations of these firms are in every respect identical to those employed by the defendant. The defendant concedes that were it to assume to lay street underground cables of its own for the transmission of the electronic signals or impulses — rather than utilize, with the consent of the telephone company, the subsurface cables of the latter — the city would be warranted under its charter in requiring the defendant to procure a franchise. But, says the defendant, as the city charter provision read from its inception and as it reads at present, it is inapplicable to the defendant as it has been and is now conducting its business. Thus, the plaintiff’s case is necessarily built upon the thesis that the mere transmittal of electronic signals by means of the underground cable facilities of the New York Telephone Company constitutes such an “ occupation ” or “ use ” of the city’s streets by the defendant as would require it to obtain a franchise from the Board of Estimate.
The defendant’s answer is, to me, persuasive. And this I say although I have not been able to find, in this State, a *593 specific authoritative precedent. I hold that the “franchise” power of the Board of Estimate is limited by the statute to a grant of consent for the “occupation” or “use” of the streets in a physical, tangible sense, and that the passage of television signals, in and of itself, by means of the telephone company cables does not constitute such ‘[1] occupation ’ ’ or “use” of the streets as comes within the jurisdiction of the Board of Estimate to franchise.
The background and the history of the charter provision and related statutes support the construction I have determined I must give to the charter provision. Concern with over-utilization of the city’s streets was expressed by the Court of Appeals in Ghee v. Northern Union Gas Co. (158 N. Y. 510, 514) where the court said: “The use of the space in the streets of New York, whether on the surface or beneath it, has been steadily growing in importance and value, and will probably so continue for many years to come. The accumulation under ground, during the past few years, or sewers, electrical subways, cable and electrical railway conduits, pneumatic tubes, steam-heating, water and gas pipes, seems to indicate that the day may come when there will be no more unoccupied space beneath the surface of the streets, and of this situation the legislature and the learned commissioners who drafted the Charter [L. 1897, ch. 378] undoubtedly had full knowledge.”
The language used by the court is pertinent here because it shows that control was needed over physical objects, such as cables, wires, pipes and other structures, rather than over the electromagnetic waves or electrical currents which pass through them. The phenomenon of electricity and the manner of its transmission were by no means unknown at the time, but the Legislature did not in 1897 include its subsurface passage, per se, as a basis for the requirement of a franchise arising by virtue of the physical use or occupation of the city streets. And chapter 629 of the Laws of 1905, which amended the 1897 City Charter as re-enacted in 1901, provides in section 242 thereof for franchise grants in substantially the same language contained in section 362 of the 1938 Charter, and re-adopted in 1961, the charter now in force.
Another indication that the franchise power vested in the Board of Estimate pursuant to this section is limited to the physical use or occupation of the streets, above or below the surface, is to be found in subdivision 17 of section 102, of the Real Property Tax Law. Under this provision, the franchise is defined as a “ right, authority or permission to construct, maintain or operate in, under, above, upon or through any *594 public street, highway, water or other public place mains, pipes, tanks, conduits, wires or transformers, with their appurtenances, for conducting water, steam, light, power, electricity, gas or other substance.”
In People ex rel. Barron v. Knapp (208 App. Div. 127, affd. 239 N. Y. 581) the court held that a corporation engaged in the business of gathering and distributing financial news to its subscribers, using lines leased from the telephone company, and having no grant or franchise from the City of New York authorizing it to use the streets, was not subject to a franchise tax, concluding that franchise rights are only those exercised in connection with the ownership of tangible property. In that regard, the Appellate Division stated (p. 130): “ We deem it apparent that a special franchise[3] must contain two elements, the element of physical property in the streets, and the grant from the State of a right to construct, maintain or operate it. If either of these elements, the tangible or intangible, is missing, the other element cannot be a special franchise within the meaning of the law. ’ ’ And, at page 131: ‘ ‘ The rights taxable as ** * * franchises under the Tax Law are those only which are exercised in connection with the ownership of tangible property, such, for example, as tracks upon or pipes and wires laid under the street.”
The legal effect of an enfranchising consent was concisely stated for the Court of Appeals by Chief Judge Parker in the case of Ghee v. Northern Union Gas Co. (158 N. Y. 510, 513, supra) when he said that it “ operates to create a franchise *595 by which is vested in the corporation receiving it * * * [an] indefeasible interest in the land constituting the streets of a municipality.” In New York Elec. Lines v. Empire City Subway (235 U. S. 179, affg. Matter of New York Elec. Lines Co., 201 N. Y. 321) the United States Supreme Court, speaking through Mr. Justice Hughes, said in discussing the nature of a franchise (p. 192): “ Such a street franchise has been called by various names — an incorporeal hereditament, an interest in land, an easement, a right of way — but, howsoever designated, it is property.” In Matter of New York Elec. Lines Co., (201 N. Y. 321, 333) the Court of Appeals said: “We are aware that there are many cases in which the granting of a franchise and its acceptance is" spoken of as creating a right of property, but generally in those cases there had been partial performance ”. The court then goes on to say (p. 334): “ The mere granting of a permit by a city to a corporation to use the streets for a purpose, is a license merely, revocable at the pleasure of the city, unless it has been accepted and some substantial part of the work performed contemplated by the permission sufficient to create a right of property and thus form a consideration for the contract. ’ ’
Whether a franchise creates an ‘ ‘ indefeasible interest in the land constituting the streets” (in the language of the Ghee opinion) or whether it is an “ incorporeal hereditament, an easement or a right of way ” (as said in the case against the Empire City Subway Co.), or whether it is merely a license which matures into a property right upon substantial performance (as described in Matter of New York Elec. Lines Co.), it is, in any event, either immediately or ultimately an interest "of a proprietary nature in public land. Keeping in mind, as I must, that, in operating its business, the evidence shows beyond dispute that all of the cables and equipment located in or passing through or under the city’s streets are owned and controlled by the telephone company, and also that it has been shown conclusively that all of the physical cables and equipment owned or controlled by the defendant are either located in the Hotel Americana or in the buildings serviced by the defendant, and do not stand or pass through or under the city’s streets at all, it is here that the plaintiff’s reasoning in support of its contention— that the defendant cannot operate by means of the telephone company facilities without the defendant itself being enfranchised by the Board of Estimate- — -falls short of the mark.
Does the plaintiff suggest that a franchise under section 362 of the New York City Charter will give the defendant a proprietary interest in the coaxial cable owned by the telephone *596 company? Hardly so. Does it contend that a franchise will give the defendant a property interest or right to that portion of the streets now occupied by the telephone company under its own franchise? This, too, is unlikely. Does the city argue that the telephone company has not abided by its tariff, applicable here, duly filed with and approved by the Public Service Commission? It does not. Does the city urge that, by leasing its transmission facilities to the defendant, the telephone company is in violation of its own franchise? It does not; and if the substance of the city’s submission were otherwise, then the telephone company would seem to be a necessary and indispensable party for a resolution of that issue in the instant proceeding. But the telephone company is not a party, and the city has formally stated to me that it takes no position as to that company’s right to provide to the defendant the service under consideration.
Although, as I have said, I have not been referred to any binding appellate precedent in this State on all fours with the case at bar, there are judicial determinations which (as I read them) are in consonance with my holding herein, and I have not found any decisions which (properly understood) gainsay what I here resolve. I shall discuss some of them.
Two are companion cases in the Appellate Division, Third Department, known as the “ Owl ” decisions. The applicability of each is differently interpreted by one or the other of the present parties and each analysis, in turn, is vigorously attacked by the adversary. In such circumstance, I found it helpful (and probably necessary) to study the records and the briefs in both cases.
The first was decided in 1938 and is reported in Matter of Owl Protective Co. v. Public Serv. Comm. of State of N. Y. (254 App. Div. 600). Owl was engaged in operating a central burglar alarm system. Like the defendant in the instant suit, Owl was organized under the Business Corporation Law, not the Transportation Corporations Law. Also like the defendant here, Owl neither owned nor maintained its own underground cables, and did not have a franchise from the City of New York. Unlike the situation in the case at bar, the New York Telephone Company refused to lease its wires in the streets to Owl on the grounds that the petitioner would thus be conducting a telegraph service, that it was incorporated as a business corporation and not under the Transportation Corporations Law and that it had no franchise from the City of New York authorizing the use of its streets for this purpose. Owl thereupon *597 filed a complaint with the Public Service Commission, requesting that the commission require the telephone company to permit Owl to utilize that company’s facilities in accordance with its filed tariff. The commission ruled that the refusal of the telephone company to provide the service demanded was warranted, and dismissed the complaint upon two grounds: First, that the Owl Protective Co., Inc., was not incorporated under the Transportation Corporations Law; and second, that it did not hold any franchise or have any consent from the City of New York to use the streets for the purposes of its burglar alarm business. Writing no opinion, but citing Holmes Elec. Protective Co. v. Williams (228 N. Y. 407) in its memorandum decision, the Appellate Division confirmed the commission’s determination (254 App. Div. 600).
¡Some years later, another proceeding was commenced before the Public Service Commission by the Owl Protective Co., Inc., and the Electric Alarm Trade Association, Inc. In this suit, it was alleged that the telephone company refused to supply leased lines to subscribers of the burglar alarm companies, which lines extended from burglar alarms installed by these companies on the premises of the subscribers to a telephone answering service which would call the police in the event that an alarm went off at night. The Public Service Commission dismissed this complaint, saying:
11 The alarm companies have effected certain changes in their business operations since our decision in Matter of Owl Protective Co., Inc. (C. 8808) which was confirmed in Matter of Owl Protective Co., Inc. v. PSC et al., 254 App. Div. 600, (3rd Dept., 1938), and argued that by reason thereof, the decision is inapplicable.
“ The record and arguments of the complainants have been carefully considered. It is our conclusion that there is no material difference between the burglar alarm business determined to be unlawful in the prior Owl case and the burglar alarm business conducted in the manner disclosed by the present record. Accordingly, there is no basis for the issuance of an order of the type requested and the complaints should be dismissed.”
An article 78 proceeding was then instituted by the alarm companies in this court, Albany County. Special Term dismissed the proceeding, stating that the service was refused upon the ground that “ neither petitioners nor their subscribers are incorporated pursuant to the Transportation Corporations Law and that they had received no franchise from the local *598 authorities to maintain such facilities in the city streets.” The opinion then continues (not officially reported):
“ The legal issue now presented has twice been considered by our appellate courts.
“ In Holmes Electric Protective Co. v. Williams (228 N. Y. 407 [1920]) the right of the plaintiff to maintain its wires under the city streets was upheld upon the ground that it had been incorporated under the Telegraph Act of 1848, the predecessor of the provisions of the present Transportation Corporations Law, and that it lawfully conducted a telegraph business within the provisions of such statute.
“ In Matter of Owl Protective Co., Inc. v. Public Service Commission (254 App. Div. 600 [3rd Dept., 1938]) one of the present petitioners complained to the Commission of .the refusal of the Telephone Company to lease lines to it for use in the operation of a burglar alarm system maintained by it. The Commissi on dismissed the complaint, holding that under the authority of the Holmes case .the petitioner could not conduct a burglar alarm business utilizing wires in the city streets, since it was not organized under the Transportation Corporations Law and did not hold the requisite local consents. Upon certiorari to the Appellate Division, this department affirmed without opinion, also upon the authority of the Holmes case.
“ This court [Special Term] can discern no valid distinction between the facts of the present case and those in the Matter of Owl (supra). Petitioners’ complaint concerns the rationale of the appellate courts in the cases above cited and to them it must be addressed.”
On appeal, Special Term’s order was reversed (Matter of Owl Protective Co. v. Feinberg, 3 A D 2d 340 [3d Dept., 1957]). The City attempts .to distinguish Owl No. 2 from the first Owl case by pointing to the following language of the court in the second Owl case (p. 343): “ In the present case the application for a leased wire came from the customer who was to be served by the burglar alarm company, and in view of the tariff schedule mentioned conceivably this distinction might have some significance. ’ ’
Therefore, urges the city before me, the sole issue of law presented and the one to which the court in Owl No. 2 limited its decision was whether the holdings of Holmes and Owl No. 1 justified the telephone company’s refusal to lease lines to the burglar alarm company’s customers as opposed to that company itself. On the other hand, as pointed out by the defendant, the petitioners before the commission and the court were the burglar alarm companies. If, therefore, I am to consider one or the *599 other of the Owl eases as a precedent of some potency (although admittedly of no conclusive force so far as I am concerned) I must determine whether the question of the requirement or non-requirement of a franchise by a corporation which proposes to use the underground cable facilities of the telephone company was considered by the court in the second Owl case, as the defendant here argues, or whether this question was ignored, as the plaintiff contends. For the court’s determination adjudicated the right of a burglar alarm company, not its customer, to lease the telephone company wires.
In their petition before the Special Term in the article 78 proceeding, the burglar alarm companies alleged that the telephone company required that they be ‘ ‘ formed as a Transportation Corporation and * * * secure a franchise from the local authorities ” (emphasis supplied). In their supporting affidavit, the petitioners alleged that the telephone company required that they “ be formed as a Transportation Corporation rather than a business corporation and in addition thereto, secure from the City of New York, the necessary franchise for the use of the public streets ”, as conditions to leasing the telephone company’s lines for the desired service. In the memorandum accompanying the order appealed from, Special Term expressly noted that the service requested of the telephone company had been refused upon the ground that “ neither the petitioners nor their subscribers are incorporated pursuant to the Transportation Corporations Law and that they had received no franchise from the local authorities to maintain such facilities in the city streets ” (emphasis supplied). Special Term based its decision upon the first Owl case, which ruled in part that the petitioner there ‘ ‘ did not hold the requisite local consents.” In the briefs which were submitted to the Appellate Division by the telephone company and the Public Service Commission it was argued, among other things, that the petitioner (Owl) required a municipal franchise in order to lease the telephone company’s facilities running through the city’s streets. Finally, the Appellate Division noted in its opinion on reversal (p. 342) that: “ The rationale of the determination against petitioners-appellants is based solely upon the proposition that they are not incorporated under the Transportation Corporations Law * # * and hence, it is argued, are not entitled as a matter of law to use wires in the public streets as an adjunct to their business.” The opinion then continues: “ Goncededly petitioners-appellants are merely private business corporations, and possess no local consents or franchises from the public authorities ” (emphasis supplied).
*600 The record thus definitely supports the defendant’s submission, and it is my view that this issue was duly before the court and that it was passed upon by the court. As a consequence, I do not agree with the plaintiff’s interpretation of the second Owl case, nor with the limitation that is urged by the city as to the applicability of that case to the present controversy.
In my view, what the court did in reaching its determination in the second Owl case was to restudy and re-evaluate the import of the Holmes decision, resulting in its vitiation of its own prior holding in Owl No. 1. Thus, the court said (pp. 34A-345):
. “ A misconception over the effect of the decision in the Holmes case may have arisen from some language used in one of the majority opinions. For instance it was said [228 N. Y. 407, 414]: ‘ All telegraph messages are but electric signals having well-understood meanings. A burglar telegraphed his entrance. He sent his message over a wire. That his act was involuntary and unconscious made it none the less a telegraph message. ’ This language must be read in context with and in the light of the issue before the court, i.e., whether the plaintiff, incorporated as a telegraph company, was engaged, in the telegraph business in the use of its own wires. A majority of the court took the view that the plaintiff was engaged in telegraph business in conformity with the powers conferred upon it by its charter. A minority took the opposite view that it was not so engaged because its wires were not open to the public for the transmission of indiscriminate messages (emphasis in original).
“ The decision thus made shotdd he limited to the peculiar factual situation of the case and the issue involved. We find it difficult to believe that the court intended to hold that every business house that leases a wire for its own private signaling purposes becomes engaged in the telegraph business within the meaning of the Transportation Corporations Law. ’ ’ (Emphasis supplied.) And, at page 345: “ The Holmes case, as we now view it, does not support our decision in the prior Owl case as a matter of law. The significant point of distinction is the ownership and maintenance of the wires under public regulation, and not the mere use thereof. There may be other features of a factual nature which require consideration by the Public Service Commission. We limit this decision solely to the issue of law presented” (emphasis supplied). The “issue of law presented ’ ’ included the question of franchise. And, going back to page 344, the court said: “ From this brief resumé it appears to us now that the decision in the Holmes case is not decisive of a controversy such as we have here, where a business corporation *601 desires to lease wires from a public utility for burglar alarm purposes. The burglar alarm business is not subject to regulation. [Citing cases.] Possibly the Legislature might make it so, but thus far it has not seen fit to do so.”
Therefore, based upon my review of the records on appeal and of the Appellate Division’s decision in Oivl No. 1 and of its subsequent opinion in Owl No. 2, the only conclusion to which I can arrive is that the issue of municipal consent as a requisite for a corporation organized under the Business Corporation Law to use the telephone company’s underground cable facilities was duly before that court in the second Owl case and was resolved by it in the negative. The full import of that determination is that: (1) a corporation does not have to be organized under the Transportation Corporations Law in order to qualify as a lessee or user of the telephone company’s underground facilities; and (2) a business corporation does not require a local franchise or consent in order to lease lines from the telephone company. In sum, it is my opinion that, if the Appellate Division was of the view that a municipal franchise in Owl was required, then the telephone company’s refusal to render the service requested would have been proper, and an affirmance rather than a reversal of the holding at Special Term would have followed.
Notwithstanding the difficulties inherent in an endeavor to obtain a satisfactory understanding as to the applicability of the final decision in the Holmes case — brought to the surface in the Appellate Division opinion in Owl No. 2 — I cannot avoid engaging in a consideration of the import in general and of the specific impact of that precedent. The facts and issues and holdings must be gleaned from the opinions in the several courts before which that proceeding came (see Holmes Elec. Protective Co. v. [Armstrong, subsequently] Williams, 97 Misc. 184, affd. 181 App. Div. 687 [1st Dept.], revd. 228 N. Y. 407).
In 1883, plaintiff Holmes was incorporated under the Telegraph Act of 1848 and the various amendatory statutes (now incorporated into the Transportation Corporations Law). It conducted a burglar alarm business; a protected premises was connected with a central station by means of low-tension electric wires which ran over housetops, over and along private property, and across city streets; an unauthorized entry into the premises registered an alarm in the plaintiff’s central office. Watchmen were employed to inspect both the subscriber’s premises and the burglar alarm apparatus installed therein by plaintiff. In 1891, pursuant to the requirements of the Board of Electrical Control of the City of New York, proceeding under the Elec *602 trical Subway Acts of 1884 and 1885,[4] plaintiff removed its overhead wires and installed them underground. It also paid its proper share of the expenses of the City Board of Electrical Control as well as the franchise taxes levied on it by the State for use of the city streets.
In about 1910, the City of New York first began to question plaintiff’s right to maintain its wires in the streets, claiming that plaintiff had not obtained a consent or franchise from the city as provided for in the City Charter of 1901 as amended by chapter 629 of the Laws of 1905 (§ 242). For a time, plaintiff resisted the demands that it apply for a municipal franchise. However, in about 1914, plaintiff and the city entered into an arrangement whereby a special franchise was issued to plaintiff by the Board of Estimate. Included in the instrument of grant were provisions by which plaintiff reserved its plenary franchise rights, claimed to have been granted it by the State, asserted that it was under no duty to obtain a special franchise from the city, and required the refund of payments made under the special franchise in the event that litigation contemplated by plaintiff was successful.
Thereafter, in 1916, plaintiff instituted an action for an injunction against the city, asserting that, inherent in the certificate of incorporation issued to it by the State under the Telegraph Act was a franchise or authority from the State to maintain its wires and burglar alarm system in the manner described, without local or municipal consent; that the Electrical Subway Acts operated to convert plaintiff’s overhead franchise to an underground franchise and to ratify and confirm its rights in the streets; and that, in any event, the city was estopped from denying plaintiff’s asserted rights; and judgment was also sought to satisfy and confirm those rights.
The trial court dismissed plaintiff’s complaint upon its finding that plaintiff was not a telegraph company within the meaning of the statute under which it was incorporated and under which it claimed a franchise from the State (97 Misc. 184). The Appellate Division affirmed the judgment dismissing the complaint, but on altogether different bases than those upon which *603 Special Term reached its conclusion (181 App. Div. 687). It held that since the certificate of incorporation issued to plaintiff (pursuant to chapter 265 of the Laws of 1848, as amended by chapter 471 of the Laws of 1853) appeared to be regular on its face, any question raised as to the exercise of its corporate powers, or forfeiture of its right to exercise such powers by reason of nonuser, or as concerns the validity of the corporation itself, could be challenged only by the State of New York as the creator of the corporation; and that plaintiff’s corporate existence could not be collaterally attacked by the city. Further, it was noted that the issue of validity or purpose of incorporation was not raised by the pleadings. The Appellate Division also held that, although plaintiff was organized prior to the Greater New York Charter of 1897 (under which it became necessary for a public service corporation to obtain a local franchise or consent in order to install its equipment in the public streets), it was nevertheless incumbent upon plaintiff to secure a secondary franchise from the city.
The case then went to our court of last resort in this State, where the decision of the Appellate Division was reversed (228 N. Y. 407). There, the majority, in an opinion by Judge Crane, held that plaintiff’s business involved a form of telegraphy, that it was lawfully incorporated under the Telegraph Act, and that plaintiff thereby acquired the right to use the city streets without a city franchise prior to the enactment of the Electrical Subway Acts. The court then added (p. 422): “ Any company incorporated after 1884 [the date of the first Electrical Subway Act] would, of course, be obliged to comply with the subway act provisions, obtain the consent of the municipality and, since the adoption of the charter of the city of New York, comply with sections 73 and 74 thereof.” [5]
However, as Judge Pound pointedly noted in his dissenting opinion (p. 433): “ If plaintiff is not a public service corporation, the state had granted it no rights to interfere with the primary purposes of the highway by erecting poles and stringing wires in the city streets. Its presently asserted right to place its wires in the electrical subways rests upon its right to occupy these streets.” And, at page 435, the dissenting opinion continues: ‘ ‘ The conclusion that plaintiff is not a public service corporation *604 flows naturally from the facts found. If it has the right to occupy the public streets, it also has the right of eminent domain. (L. 1848, ch. 265, as amended). These two great rights are conjoined. * * * A corporation carrying on a private business cannot exercise the privileges of one organized for a public purpose when it does not perform the duty of serving the public, which [1] goes hand in hand with the privilege of exercising á special franchise * * * by the occupation of the public highways
Belying upon the Holmes majority view, the Appellate Division in Owl No. 1 refused to compel the telephone company to lease its lines to the burglar alarm company. As I read the record and briefs in the first Owl cas?, I am led to the conclusion that the court there failed to observe the distinction between a burglar alarm company which owned and maintained its own wire system (and therefore itself physically occupied the city streets) and a company which did not occupy the streets at all, but merely sought to use the telephone company’s street facilities which had been installed pursuant to the latter’s own franchise. This difference was adverted to by the Appellate Division in Owl No. 2 when it said (p. 345): “ The Holmes case, as we now view it, does not support our decision in the prior Owl case as a matter of law. The significant point of distinction is the ownership and maintenance of the wires under public regulation, and not the mere use thereof.” And that, I believe, was the controlling factor in that court’s determination.
While, as I have already indicated, I can find no authoritative precedent in this State which deals squarely with the issues in the case at bar, I have been cited (and I have unearthed) a number of out-of-State judicial decisions and administrative determinations that do bear upon the right of a telephone company to transmit audio and visual signals over its facilities pursuant to an approved tariff, and also upon the right of a subscriber to this service (who does not himself physically occupy the city streets with his own cable) to use the telephone company facilities without obtaining a municipal franchise or consent therefor.
In Jackson v. Michigan Bell Tel. Co. (63 PUR 3d 384 [Mich. P. S. C., 1966]) a municipality granted a franchise to a CATV firm known as the Jackson Television Cable Co., which proposed to transmit its television signals either by using its own poles or by means of pole rental agreements with the telephone company. A competitor, Cascade Cable Television Co., without a franchise from the City of Jackson, proposed to operate its business by means of the tariff service offered by the telephone com *605 pany, as in the case at bar. The city sought to prevent the telephone company from furnishing its service to Cascade. The Michigan Public Service Commission found that ‘ ‘ the technical problems encountered in the transmission of television channels * * * are the same as those encountered in the transmission of other high frequency broadband communication channels, such as closed circuit television, facsimile, and data transmission; thus, this tariff [CATV] offers an established type of service, put to a different use than previous tariff offerings, and is a part of the overall communication services of Michigan Bell Telephone Company.” The commission concluded that the telephone company could properly render the service to Cascade, whether or not the latter had acquired a municipal CATV franchise.
Thereafter, the telephone company, pursuant to its approved tariff, entered into a contract with Cascade whereby the former agreed to furnish Cascade channels to be used for television transmission within the City of Jackson, and Cascade filed with the telephone company an order for the installation by the telephone company of two miles of CATV circuits to be operated by the telephone company pursuant to the contract between these parties. The arrangements entered into between the telephone company and Cascade were quite similar to the arrangements entered into between the present defendant and the New York Telephone Company. It was the plan of Cascade to erect an antenna system on privately owned land outside the city limits of Jackson, and to transmit television signals over cables traversing the streets of the City of Jackson, which would be owned and operated by the telephone company, and then to run transmission wires from that company’s cables to the private homes of subscribers of Cascade’s community antenna television service.
Thereupon, and prior to any further implementation of the contract, the City of Jackson promulgated an ordinance which, in its most pertinent portion, provided as follows: “ No person, firm, or corporation shall install, or operate a community antenna television system in the City of Jackson without having first obtained a franchise from the City of Jackson authorizing the establishment of such a business nor shall any person, firm or corporation, furnish such service without having first obtained such a franchise. No person, firm, or corporation shall use, occupy, or traverse city streets, lanes, avenues, sidewalks, alleys, bridges, or any other public place in the City of Jackson, for the purpose of installing, operating, or furnishing community antenna service to subscribers without first having obtained the *606 franchise herein required.” The city also instituted an action for a declaratory judgment, contending that the Michigan Bell Telephone Company and the Cascade Cable Television Company had no right to carry on the business they proposed and requested that the court enjoin both the telephone company and Cascade from installing wires and cables for the purpose of carrying on a community antenna television service (City of Jackson v. Michigan Bell Tel. Co., File #C4-64 [Cir. Ct., Hillsdale County, Mich., Feb. 14, 1966]).
As to the Michigan Bell Telephone Company, the court was of the view that that company was not strictly limited under its franchise from the State to the transmission of sound only, and that the word “ telephonic ” as used in the enabling legislation, under which that franchise was granted, was understood to mean that a telephone company was transmitting a series of electronic impulses which varied in intensity. The court then went on to say:
“ As time went on, and as science progressed, man learned to translate such electronic impulses on suitable recording tape to a variation of dots and vacant spaces, which, when placed in a composite relation to one another, produced a picture. It then became common practice for telephone companies to transmit over their lines such electronic impulses to provide newspaper pictures originating from a considerable distance away, thus, in our evening newspaper we may see a picture of an event which occurred in London, but a few hours before. That the service of telephone companies is not restricted to individual messages between individual persons is illustrated in its successful operation of Musak, providing pleasant and uninterrupted music to hotels, restaurants, beauty salons and similar places. Further extending service, telephone companies provide through their lines, controls for expressways, educational programs for schools and for private institutions, all of which are network programs, disseminated to the general public.
11 The transmission of these additional facilities to the general public whether by individual contact or by general transmission to a group of persons, places no additional burden upon the streets and alleyways of the cities involved. To the extent that the operation of a utility is dangerous to the health and welfare and the police powers of municipalities involved, certainly the municipalities have the right to regulate. For instance, a telephone company cannot- place a telephone pole in the center of a busy intersection, nor can it string lines or cables which interfere with electrical systems, with trees, with overhead trolley wires, with aviation facilities; [the] right for such control is maintained *607 within the municipality, but when a public utility undertakes additional electronic transmissions which place no additional burden upon the physical operation of the city itself, the city cannot argue that it has a right to issue a special franchise for such additional transmissions.”[6]
The court next considered whether or not Cascade, the CATV company, was so using the streets of the city as to require it to have a municipal franchise. That issue was resolved in the negative, the court stating: “ Up until the present consideration of this motion, the City of Jackson had set forth no factual data which convinces this court that the use of Michigan Bell Telephone Company transmission lines to carry the CATV service of defendant Cascade Cable Television Company, places any additional burden upon the streets and alleyways of the City of Jackson which would enable the City to prohibit such additional service. The City of Jackson certainly could not require franchise from Radio Station WJR of Detroit to transmit radio broadcasts which are received upon antennas of residents of the City of Jackson and this court can draw no distinction between such broadcasts and the activities of defendant Cascade.”
The court commented that under the method employed by the Jackson Television Cable Company (operating in pursuance of a pole rental agreement but using its own cables or using its own poles and cables) the ordinance requiring a franchise was ‘ ‘ in all probability ’ ’ valid. However, concerning the method employed by the defendant Cascade, the court said: ‘ ‘ This court does hold, as a matter of fact, that the defendant Cascade Cable Television Company is not [in the words of the applicable legislation] * * * installing nor operating a community antenna television system in the City of Jackson. Its operations are confined without the City of Jackson, and its transmissions are being made by the Michigan Bell Television Company, which holds a State franchise which the plaintiff City of Jackson cannot usurp.”
In City of Waterville v. Bartell Tel. TV Systems (233 A. 2d 711 [Me.]) the defendant Bartell, a CATV company, had installed an antenna system on private property in a community adjoining the City of Waterville, and it was also engaged in installing wiring in its subscribers’ premises within the city. In its operations, Bartell did not physically occupy the city streets with its own equipment, but instead used the transmitting *608 facilities owned and controlled by the defendant New England Telephone and Telegraph Company. The city brought an action for injunctive relief (a) to prevent defendant Bartell from offering CATV service to subscribers without a municipal franchise or permit therefor and (b) to prevent defendant New England from transmitting Bartell’s television signals by means of New England’s cables and equipment to Bartell’s customers under a tariff filed with and approved by the Public Utilities Commission of the State of Maine. The statute involved provided that municipal officers could contract on such terms and conditions as were in the best interests of the municipality for the placement and maintenance of community and television systems and appurtenances along public ways. The Supreme Court of Maine pointed out (p. 715) that Bartell neither needed nor intended to install any of its own equipment in or along any public ways in Waterville, and that, acting upon the assumption that a permit or contract was therefore not required, it had applied for none from the city, and held “ that Bartell was correct in this legal assumption and that the enabling act, 30 M.RS.A. Sec. 2151, Subsec. 2 as amended, had application only to the ‘ placing and maintenance of community antennae television systems and appurtenances- along public ways ’ ”. As to the telephone company, the court was of the view that, inherent in the franchise granted it by the State of Maine, there was included authorization to transmit television .signals by use of its cables and equipment, without the requirement that it secure an additional municipal franchise for this purpose.
In Ball v. American Tel. & Tel. Co. (227 Miss. 218) a proceeding was instituted to enjoin a telephone company from using a right of way, acquired for telephone and telegraph purposes, for the transmission of CATV signals. The Supreme Court of Mississippi posed the issue as follows (pp. 22-1-225): “ May a telephone and telegraph company, which had constructed a telephone and telegraph cable line under an easement acquired by exercising the right of eminent domain, use the facilities thus constructed for television transmission along with telephone and telegraph transmission?”
In affirming a dismissal of the plaintiff’s bill, the court stated (p. 226): “ Television is but one of many scientific achievements of the past few decades made possible by developments of the carrier art. Some of the others are radio, teletype, and the photograph, each of which employs electrical impulses in transmission. All these devices to some extent make use of cables and wires in the transmission process. Transmission techniques developed by or as an adjunct of the telephone business [have] *609 made possible the services performed by these devices. We should not construe the eminent domain statute's so as to require the telephone and telegraph companies to secure new easements for each new device that employs the use of electrical impulses even when a new device performs'a function other than the transmission of sound or articulate voice. To do so would lead to absurd and unreasonable results. We conclude that television transmission is an integral part of the telephone and telegraph business as it has developed and now exists. It follows that an easement acquired by eminent domain for telephone and telegraph lines, as the statute authorizes, may be used for television transmission along with other telephone and telegraph purposes.”
In Ohio Tel. & Tel. Co. v. Steen (85 N. E. 2d 579 [Ohio]) plaintiff filed a petition to condemn a certain strip of land belonging to defendant to complete plaintiff’s right of way for a proposed underground communication system. Defendant contended that plaintiff had no right to condemn his property because at some time in the future the proposed line across his property would be used for transmission of television signals. The Court of Common Pleas of Ohio, in sustaining plaintiff’s right to condemn defendant’s land, expressed the opinion (p. 580) “ that the transmission of television is merely an advancement or improvement in the art of telegraphy and telephony and therefore the right of eminent domain for telegraph and telephone purposes conferred by Gr. C. Sec. 9172 and 9191 is applicable to television. ’ ’
In Independent Theatre Owners v. Arkansas Public Serv. Comm. (235 Ark. 668, 671) the Supreme Court of Arkansas held that the sending of electrical impulses which produce picture and sound through coaxial cables owned by a telephone company was ‘1 conveying a message or communication by telephone or telegraph ” within the meaning of the statute making such service a public utility, and subject to regulation by the Commission. In Midwest Video Corp. v. Southwestern Bell Tel. Co. (39 PUR 3d 496 [Ark. P. S. C., 1961]) a CATV company sought to compel a telephone company to provide channel service at rates to be approved by the commission. Treating the case as involving public utility service which the telephone company necessarily (p. 499) 11 undertakes to provide to all members of the public who desire it ”, the commission ordered the CATV service to be rendered to the petitioner.
The Colorado Public Utilities Commission has held that a CATV company physically occupying the city streets with its own cable would require a local franchise, but that such local franchise or consent is not necessary where the CATV operator *610 uses the telephone company’s transmission facilities pursuant to an approved tariff, as in the case at bar (Mountain States Tel. & Tel. Serv. for Use in Community Antenna Tel. (CATV) Systems [Decision No. 70749, Jan. 25,1968]).
The plaintiff relies on Owl Protective Co. v. Public Serv. Comm. (123 Pa. Super. Ct. 382) as authority for the proposition that a prospective user of the telephone company’s wires cannot avail itself of such facilities without a municipal franchise. My analysis of that case convinces me that it is distinguishable on two counts: first, because, in the Pennsylvania proceeding, the plaintiff sought the exclusive use of the telephone company’s wires, as opposed to a service offered (as in the case at bar) to all subscribers on an equal basis pursuant to a tariff, duly approved by the Public Service Commission; and second, because the Philadelphia ordinance, which granted the telephone company the right to use the city streets, prohibited that company from leasing its lines to anyone who had not first secured a consent from that city. There is no such inhibiting legislation applicable here, in the light of the fact that the New York Telephone Company’s franchise, authorizing the use by it of the streets of the City of New York, granted that company by the State of New York, antedates any alleged requirement of a secondary consent from the City of New York.
We return now to our own State. A helpful nisi prius case is that of Town of New Windsor v. New York Tel. Co. (Donohoe, J., Index No. 1207/67, Sup. Ct., Orange County, June 14, 1967), which was presented to the court on a motion by plaintiff for a temporary restraining order. Defendant Hightower Telesystems, Inc., is the operator of a CATV system. It had not obtained a franchise from the Town of Windsor. Bather than install its own cables to convey and distribute the television signals, it contracted with the defendant New York Telephone Company to perform this service for it. Under this arrangement, the telephone company was to pick up signals at or near the antenna system of the defendant Hightower and transmit them to the buildings where the final users of the service resided and where Hightower would again pick up the signals and conduct them to individual television sets.
As to the defendant telephone company, the court stated: “ The difficulty with plaintiff’s position on this motion is that New York Telephone Company was incorporated as a telephone and telegraph company in 1896 and has ever since had a franchise, granted by the State of New York, under its certificate of incorporation as a transportation corporation, to use public streets, roads and highways for transmitting communications of *611 various kinds by wire. The variety of forms of communication which this defendant is authorized to convey and distribute has not been thoroughly listed or defined. In Harper v. City of Kingston, 17 Misc 2d 627, the Court cited authorities which recognized the broad powers in communication granted by the Transportation Corporations Law and extended them to include transmission of stock quotations and relaying of radio broadcasts. The Court held that a firm engaged in relaying and distributing television signals is a transportation corporation within the meaning of Article 3 of the Transportation Corporations Law. It is arguable therefore that New York Telephone Company needs no further franchise to perform the services in issue here.”
As to the defendant Hightower, the court stated: 11 The defendant, Hightower Telesystems, Inc., has not ventured upon or threatened the erection of any facilities in the public streets of New Windsor, having decided to leave that phase of communication up to the Telephone Company. In Hightower’s case no restraint is indicated.” Although the foregoing opinion was rendered on a motion for a temporary injunction, the court expressed the view that the entire action could be disposed of on a motion for summary judgment, if the parties were so advised to proceed.
Another case affirming the right of the New York Telephone Company to transmit television impulses over its cables as part of a telephonic service rendered to privately owned community antenna television companies has been disposed of administratively. That case is Matter of New York Tel. Co. (34 PUR 3d 115 [I960]). There, the New York Public Service Commission said (pp. 121-122):
“ The telephone company does not propose, under its tariff Tl, to become an antenna company. It is not going to sell any service to the owners of television sets or erect any master antennas. The service offering is limited to conveying (transporting or transmitting) for an antenna company, television signals from one point to another. Services of a like character are presently provided by the telephone company pursuant to filed tariffs; for example, the telephone company provides channels for teletypewriter, teleprinter, telephotography, telautograph, Morse, and facsimile communication. In addition, channels are provided for the transmission from point to point of program material such as music or other sound and for video program material. Similarly, the telephone company by offering channels to an antenna company is offering to provide a com *612 nmnication service — a variety of telephony or telegraphy— and nothing else.
“ The mere fact that at this stage of the development of this form of picture and sound transmission special coaxial cable and other special equipment must be installed in order to provide this particular service does not militate against the conclusion that the telephone company is providing telephone or telegraph service. A conclusion about the commission’s jurisdiction over the service proposed to be provided under tariff T1 cannot be made to depend upon the type of system used, i.e., coaxial cable or ordinary telephone wires, but must be based on a determination whether thereby a telephonic or telegraphic communication service is being provided. We think one is.
“ It is clear that the telephone company is undertaking to transmit intelligence from one point to another for the benefit of a subscriber, using principles of telephony (or telegraphy). It proposes to provide this service upon similar terms to one and all seeking it. The company’s filing of a tariff covering the service was proper.
[1] ‘ Of course, this determination does not in any way alter the status of community antenna television companies which, to date, have not been subjected to rate or service regulatory supervision under the laws of this state. ” And, on page 123, the commission concludes: “ Protestants ’ real objective would appear to be to insulate their own businesses from competition by other antenna companies that might desire to enter the field and utilize the service proposed to be provided by the telephone company. At the present time antenna companies are not regulated and, therefore, are not protected against competition from other antenna companies. Further, there is no problem of competition between the telephone company and the protestants because the telephone company is not proposing to go into the community antenna business but merely proposes to provide channels for those in it who may desire to make use of such facilities. ’ ’
That chapter (14) of the City Charter which includes section 362 is entitled “ Franchises ”. Thus far I have discussed that provision of the section as refers to “ franchises ”, for the gravamen of the plaintiff’s suit, as projected by its complaint, is that the defendant is using and occupying the city streets for the purpose of operating its CATV business without having obtained the allegedly required franchise or consent. However, the city notes in its brief that the statute states, as well, that (except as otherwise provided in the charter — an exception not here relevant) the Board of Estimate “ shall have the control of the streets of the city” (my emphasis), and as a consequence the *613 argument is advanced that, assuming that the defendant need not have a municipal “ franchise ’ ’, the city may, by virtue of its broad power of “ control ”, nevertheless require its consent for the use by the defendant of the underground telephone company cables already there. Neither the language of the section nor its history supports this contention.
As to the words of the statute, the intent is clear: Firstly, “control” means “ regulation ”, indeed “ reasonable regulation ”,[7] not blanket prohibition (see Village of Carthage v. New York Tel. & Tel. Co., 185 N. Y. 448). Secondly, there has been no regulation duly adopted by the Board of Estimate applicable to the defendant’s business. Thirdly, as I view it, the provision permitting the exercise by the board of its authority of control, as contemplated in the section, refers to the use or occupation of the streets in a physical, tangible, sense; and that, as has been seen, is not the case here.
Moreover, it was in the 1905 City Charter that the Legislature first delegated the power of control of the streets to the Board of Estimate. That enactment cannot adversely affect the franchise granted by the State prior thereto to the New York Telephone Company (see Ghee v. Northern Union Gas Co., 158 N. Y. 510, 514, supra; Barhite v. Home Tel. Co. of Rochester, 50 App. Div. 25, 32; Village of Carthage v. New York Tel. & Tel. Co., 185 N. Y. 448, supra; cf. New York Tel. Co. v. City of Binghamton, 18 N Y 2d 152, supra.)
In any case, scanning the statutory scheme here established in the City Charter, the “ control ” granted the Board of Estimate by section 362 is necessarily associated with its power to grant a ‘1 franchise ’ ’, and that is necessarily dependent upon the permittee’s physical use and occupation of the public streets. Section 363 provides that “ Every grant of or consent to a franchise of any character or modification thereof must be by contract executed under the authority of the board of estimate ”. Section 364 fixes time limitations for such a contract. Section 365 provides that 1 ‘ At the termination of such contract all the rights or property of the grantee in the streets of the city shall cease without compensation”; and section 374 provides that ‘1 Consent to construct and use for private use pipes, conduits and tunnels under, railroad tracks upon, and connecting bridges over, any of the streets of the city * * * shall be revocable at any time by resolution of the board of estimate ”. Section 366 of the charter states that the franchise contract may provide that, on its termination, 11 property, plant and equipment of the *614 grantee ’ ’ shall become the property of the city, with or without payment therefor as therein provided. This section further provides that ‘‘ The City shall have the option either to take and operate on its own account the property, plant and equipment when so acquired, or to lease the same ” for a limited term as therein specified. And section 367 imposes upon the contracting enfranchised company the obligation to “ maintain ” such ‘ ‘ property in good condition throughout the full term of the grant.” What is contemplated by these sections, therefore, is the use or occupation of the streets by physical objects, and that is not the case with this defendant.
As a condition precedent to obtaining the municipal consent which each applied for and was granted, the three permittees hereinbefore referred to were required to enter into contracts with the city which contained certain commitments and conditions. Under these agreements, the CATV company may not, for example, engage in program origination or in pay television or receive and deliver television or radio broadcasts from outside the New York metropolitan area, but must limit itself exclusively to signals broadcast regularly by all television stations in that area. The permittee is also required to take certain precautionary measures to prevent interference with other electrical systems now in operation. Additionally, it must, among other things, warrant to produce television pictures of good quality; provide service to city agencies and eleemosynary institutions without charge or at a reduced rate; not interfere directly or indirectly with any tenant within a serviced building who might desire to use his own antenna or master antenna system; indemnify the city for damages resulting from personal injury, property damage or violations of the copyright law; pay the city 5% of its annual gross receipts; and obtain approval of the Board of Estimate prior to any change in the control of the company. The defendant is engaged in the operation of its business without these contractual restrictions, albeit it may abide by some of them on the basis of its own voluntary business discretion or contracts or of its compliance with the requirements of the tariff of the telephone company as approved by the State Public Service Commission.
The three other community antenna television companies were granted franchises to install their own cables in the city streets, although they were at liberty to use the underground facilities of the telephone company if they chose to do so. What is objected to by the plaintiff, therefore, appears to be not the use of the streets by the telephone company, or any action by *615 the telephone company in affording its service to the defendant in pursuance of the approved tariff, but rather that the defendant is engaged in an economic activity in New York City for which the plaintiff believes a franchise is required from the Board of Estimate.
Regulation and franchise are not necessarily synonymous legal concepts. Ignoring this precept, the plaintiff, in the case at bar, seems to equate the act of franchise or its concomitant consent as used in the city charter with permission to conduct a particular type of business. It does not contest the telephone company’s right under its own franchise to lay cable in the streets and to use it in connection with the transmission of electronic impulses. Indeed, the testimony before me shows what the decisions hereinbefore discussed point out — that there are a number of various businesses that lease lines from the telephone company pursuant to filed tariffs. These include channels for teletypewriter, teleprinter, telephotography, music by Muzak, stock quotations for the New York Stock Exchange, and the financial news service of Dow Jones Inc. The telephone company also receives and delivers to radio and television broadcasters live broadcasts which originate at points which are distant from the broadcasting facilities, in the same manner in which the defendant receives and delivers its electric signals.
In holding, as I do, that the defendant may conduct its CATV business as presently operated without being subject to the control of the Board of Estimate, I do not want it to be assumed that I have overlooked the plaintiff’s arguments in respect of the public interest in the rapidly expanding CATV industry and its ramifications. I recognize, of course, that television today is a principal medium of mass communication, that its use can no longer be considered a personal luxury, and that, indeed, it may well become a national necessity. Copyright problems abound (see Meyer, The Nine Myths of CATV, 27 Fed. Bar J., p. 431 [1967]). I apprehend, too, that, amidst the vigorous controversies taking place between the broadcasting and CATV companies and among the CATV operators themselves— each desiring to secure an advantage over his competitor by means of a monopoly protected by a local franchise —■ the consumer may become the forgotten third party, and that exorbitant fees for CATV installation and service may in many instances result in the denial to the less affluent citizen access to well-transmitted public information, to which he is entitled and which it may be to the public’s interest that he have.
One way of controlling the type of service and the matter of charges to the consumer is to encourage competition in the *616 industry through the use of the telephone company’s transmission facilities under its regulated tariff. Although the telephone company may not itself engage in the CATV business, its service is available on an equal basis to any person desiring to enter the field. (See Matter of New York Tel. Co., 34 PUR 3d 115 [1960], supra). Another method of public and consumer protection may be the establishment of nonexclusive licenses to be issued by CATV operators in the same manner as other legitimate business enterprises are licensed. This approach includes the actual feature of price control by way of licensing administration as well as the potential element of likely reduced rates through competition, since a permit under this arrangement could be procured by any qualified applicant able and willing to render satisfactory service. An additional alternative is to place CATV in the same category as a traditional public utility. The Federal or State administrative agency would be granted jurisdiction authorizing it to establish rates and supervise the quality of .service.
In the light of the various proposals as to the appropriate agency to be charged with the responsibility of control and of the several franchise limitations provided by the Board of Estimate for CATV companies (however beneficent some of those contractual requirements may be) the question that arises in respect of that is whether the power of control and regulation of the CATV business — as distinguished from the power of control of the streets of New York City — is, under the existing state of the law, a function of the Board of Estimate rather than, let us say, of the City Council or the Mayor, or both or all, or one or another body, department or officer of the city or, indeed, whether that is not truly within the statutory competence of the Public Service Commission of New York State or within the constitutional jurisdiction of the Federal Communications Commission. Certainly, consideration of the expert facilities available to an administrative agency, schooled in the immediate and long-term goals and problems of the industry and needs of the consumer and the public, is not a far-fetched thought. (Cf. Meeks, Economic Entry Controls in POC Licensing, 52 Iowa L. Rev., p. 236 [1966]; see State of New York v. New York Movers Bur., 48 Misc 2d 225, 236; Matter of Panzer v. Berman, 53 Misc 2d 122,129; American Mach. & Foundry Co. v. Santini Bros., 54 Misc 2d 886, 900; see, also, Buckeye Cable-vision v. Federal Communications Comm., 387 F. 2d 220; Cedar Rapids Tel. Co. v. Federal Communications Comm., 387 F. 2d 228; but see Southwestern Cable Co. v. United States, 378 *617 F. 2d 118, cert, granted 389 U. S. 911 [revd. 392 U. S. 157 (Rep.].)[8]
There may be other adequate means of control. 'Section 362 of the New York 'City Charter is not, I hold, one of them, for, under the conclusive evidence presented to me, the defendant is neither using nor occupying the city streets, as are the three CATV companies which have applied for and received franchises from the Board of Estimate and made contracts with the city, and have, in pursuance thereof, installed their own cables underground. I have necessarily limited my judicial sights to the charter provision which the plaintiff has invoked. Whether the law should be otherwise, in view of the scientific developments since the enactment of the statute as initially and still presently worded, is a matter for legislative consideration and determination, not judicial misinterpretation.
Accordingly, judgment is rendered in favor of the defendants, denying the injunction sought by the plaintiff and dismissing the complaint on the merits.

. The defendant Bell owns 90% of the outstanding shares of the capital stock of the defendant Comtel. For the purposes of this decision, the defendants will be treated as one.

. A technological conclusion similar to the one which I have here arrived at — couched in some respects in other terminology — • appears to have been reached in United Artists Tel. v. Fortnightly Corp. (255 F. Supp. 177, affd. 377 F. 2d 872, cert, granted 389 U. S. 969, revd. 392 U. S. 390). While that is a copyright case, what the learned court at nisi prius said there in explaining the function of an amplification system is apposite here (p. 192.):
“ The operations of the foregoing system * * * among other effects, modulate, on new carrier waves derived from locally supplied electrical energy, the pattern of variations of the input signals. Thereby, there are created output signals which are replicas in electronic terms of the input signals.
“ These output signals, while completely new, represent the same video and audio information and intelligence as did the input signals. The signals representing both the video and sound do not move as preserved electronic entities through the system, for at each stage of amplification or modulation a new duplicate of the input is made; the input signals are dissipated and lost and do not join or become part of the output signals. The net effect of defendant’s electronic processing is to transmit through defendant’s coaxial cables to its subscribers reproduced signals on new carrier waves.”

. The distinction between a general franchise and a special or secondary franchise (as it is sometimes called) is noted in People ex rel. Metropolitan St. Ry. Co. v. State Board of Tax Comrs. (174 N. Y. 417, 435 — 436). A general franchise gives a corporation the right to exist and do business by virtue of the corporate powers granted it by the State. On the other hand, “When a right of way over a public street is granted to * * * a corporation * * * the privilege is known as a special franchise, or the right to do something in the public highway, which, except for the grant, would be a trespass.” This difference was of no moment prior to the delegation of the power of franchise by the State to the respective municipalities (see Village of Carthage v. Central N. Y. Tel. & Tel. Co., 185 N. Y. 448; see, also, Holmes Elec. Protective Co. v. Williams, 228 N. Y. 407, infra) where it was held that a corporation organized under the Telegraph Act of 1848 as amended, and prior to the enactment of the New York City Charter which gave the city the power of franchise, did not require a special or secondary franchise from the city in order to lay its wires under the city’s streets). However, in the case of a public service corporation organized subsequent to the promulgation of the charter, it was held that a secondary or special franchise from the city ,was required to enable the company thus to install its equipment (Matter of New York Independent Tel. Co., 133 App. Div. 635, affd. 200 N. Y. 527).

. These enactments required public service corporations, which had theretofore been authorized to maintain wires and cables above the street surface, to place the same in underground duets constructed for that purpose. The statutes have been characterized as regulatory only, invoking the police power of the State (People ex rel. New York Elec. Lines Co. v. Squire, 107 N. Y. 593). As Judge Pound indicated in his dissenting opinion (concurred in by Judge Cabdozo) in the Holmes case (228 N. Y. 407, 432, infra) the right of franchise with its concomitant privilege to use the streets is one thing, the regulation of the right is another.

. A complete reference would be to sections 72, 73, 74 and 242 of the then effective charter.
The majority of the Court of Appeals thus seemed to he of the view that the requirement of municipal franchise or consent applied only to corporations organized after the adoption of the charter — and not to those in existence prior thereto.

. I note in passing that there was no proof before me that the transmission by the defendant of the electronic impulses through the telephone company cables interferes in any way with the use or occupation of the under-surface street ways by any one.

. See New York Tel. Co. v. City of Binghamton (18 N Y 2d 152,160).

. See The Federal Communications Commission and Regulation of CATV (43 N. Y. Univ. L. Rev., pp. 117, 122-124 [1968]).